## Elkhorn Star Coal Company v. Hall, et al.

(Decided December 14, 1927.)

### Appeal from Floyd Circuit Court.

1. Mines and Minerals.—Where a clause in a coal land lease provided for a minimum annual royalty, with a provision for a certain ton royalty, but that the lessee should not be liable for royalty payments when delayed in mining on account of causes beyond control, such causes held not to include troubles in selling the coal.

2. Mines and Minerals.—Where a coal land lease provided that the lessee should pay a minimum annual royalty and a ton royalty, but provided that if in any year the annual royalty was in excess of the ton royalty, the lessee could reimburse itself the following year for such excess, "year" held not construable as "years," so did not permit lessee to reimburse itself for excesses that had accumulated over a series of years.

3. Contracts.—The court cannot disregard words of a written contract or read words out of it, in the absence of other words of the instrument itself warranting such action.

EDWARD L. ALLEN, A. J. MAY and S. S. WILLIS for appellant.

A. B. COMBS and B. F. COMBS for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Appellees are the owners of a valuable tract of coal land in Floyd county. On August 14, 1917, in consideration of $100 paid in cash, they leased it to Thomas B. Powell, from whom the lease passed by proper conveyance to the King Elkhorn Coal Company, which operated the lease until January 19, 1920, when the Elkhorn Star Coal Company purchased it, and that company operated it until this suit was brought in the spring of 1925 by appellees to recover an alleged balance due them on the royalty reserved in the lease. The lease contained the following provisions:

"Said party of the second part hereby covenants and agrees to enter on said premises within 60 days from date hereof, build a tipple, and mine for said coal, and if the same be found in sufficient quantities and under circumstances to justify said party of the second part in mining the same, then and in such case said party of the second part hereby agrees to pay to said party of the first part as royalty the sum of twelve and one-half (12½ cents) per ton for each ton of two thousand two hundred and forty (2,240) pounds of coal mined and shipped from said premises by said party of the second part. This lease does not contemplate a royalty on any coal used in the making of steam for the plant of the party of the second part.

"Said party of the second part further agrees, after the expiration of six months from the date hereof, he will mine not less than 500 tons of coal from said premises per month during the first 12 months of operation, and ten hundred (1000) tons per month thereafter; however, if he should not mine this amount, then said party of the second part promises to pay to said party of the first part a sum equal to the royalty of said 500 tons for the first six

months and 1,000 tons thereafter at the rate hereinbefore stipulated; provided however, that any amount thus paid in excess of the royalty on coal actually mined shall be applied in payment for that subsequently mined the following year in excess of the minimum yearly royalty hereafter provided for, and provided, however, the party of the second part shall not be delayed in mining on account of car supply, strikes or causes beyond control.

"It is further agreed that the party of the second part will pay said parties of the first part or their heirs the sum of two thousand ($2,000) dollars, in advance annually as a minimum royalty.

"It is understood and agreed that the one hundred ($100) dollars, heretofore mentioned, shall be credited on the first minimum royalty, and it is further understood that the two thousand dollars ($2,000) royalty stipulated to be paid is not to be paid until the railroad is completed so that the coal may be shipped therefrom, but the same will be due and payable as soon as the road is completed so that coal may be shipped therefrom."

The railroad was not completed until March 19, 1918. The King Elkhorn Coal Company paid the minimum royalty of $2,000 for the year beginning March 19, 1918, and the year beginning March 19, 1919, and got out 17,083.53 tons, which at 12½ cents a ton amounts to $2,153.44. The Elkhorn Star Coal Company paid the minimum royalty annually on or about March 19 of each year thereafter, making eight years' payment of minimum royalty, amounting to $16,000. It got out before February 28, 1920, 1,165.67 tons of coal. The amount of coal gotten out thereafter and the amount of royalty thereon are as follows:

|  | Tons. | Amount. |
|---|---|---|
| March 1, 1920, to March 1, 1921 | 13,781.00 | $1,618.31 |
| March 1, 1921, to March 1, 1922 | 140.63 | 17.58 |
| March 1, 1922, to March 1, 1923 | 17,683.48 | 2,210.43 |
| March 1, 1923, to March 1, 1924 | 20,604.24 | 2,575.53 |
| March 1, 1924, to March 1, 1925 | 15,581.56 | 1,947.50 |
| March 1, 1925, to December 1, 1925 | 57,065.75 | 7,133.21 |

The totals of the royalties at 12½ cents from the beginning is $17,783.91. The defendant after the suit was brought paid $1,783.91 and claimed that this was all that it owed. The plaintiffs claimed a balance of $3,712.82.

The minimum royalties for the eight years amounted to $16,000, and the defendant insists that it is only liable for the total of the royalties at 12½ cents from the beginning. In other words, it insists that the words, "the following year," in the contract, should be read as, "the following years," and that any deficiency under the minimum royalty in any year may be made up by any excess in any following year. On the other hand the plaintiffs insist that the words of the contract control and that there is nothing in the contract showing that the word "year" was used in the sense of "years." The court gave judgment in favor of the plaintiff. The defendants appeal.

No coal at all was mined in the year 1921, the coal market being in a bad condition. The defendant insists that this comes within the proviso of the contract: "Provided, however, the party of the second part shall not be delayed in mining on account of car supply, strikes or causes beyond control." But this clause refers to delay in getting the coal out or getting it to market; it does not refer to troubles in selling the coal. The words "causes beyond control" refer to mining or shipping troubles. The coal market is always beyond the control of the miner. He took the risk of the coal market in making his contract.

This brings us to the proper construction of the words, "the following year," in the contract. It will be observed that the contract provides two minimums. In the first place the lessee agrees to mine not less than 500 tons of coal from the premises per month during the first 12 months of operation, and 1,000 tons of coal per month thereafter. The monthly minimum must be given some weight. He must mine at least 1,000 tons a month after the first year. It is well known that a coal mine does not produce uniformly every month. More coal is gotten out when the market and demand are good than when these are bad. In order to make a minimum yearly royalty of $2,000, it was necessary for the lessee to get out 16,000 tons during the year. If he got out 1,000 tons any month he fulfilled the contract for that month. But the contract did not mean that he could not get out more than 1,000 tons in any month. There is therefore no inconsistency between the two provisions. One fixes the monthly minimum; the other fixes the yearly minimum. If we substitute the figures $2,000 for the words, "the minimum

yearly royalty hereafter provided for,'' the words to be construed read as follows:

> ''Said party of the second part further agrees after the expiration of six months from the date hereof, he will mine not less than 500 tons of coal from said premises per month during the first 12 months of operation, and ten hundred (1,000) tons per month thereafter; however, if he should not mine this amount, then said party of the second part promises to pay to said party of the first part a sum equal to the royalty of said 500 tons for the first six months and 1,000 tons thereafter at the rate hereinbefore stipulated; provided however, that any amount thus paid in excess of the royalty on coal actually mined shall be applied in payment for that subsequently mined the following year in excess of $2,000.''

After providing a monthly minimum of at least 1,000 tons of coal to be paid for at the rate of 12½ cents a ton, and also providing an annual cash minimum of $2,000 to be paid in advance at the beginning of each royalty year beginning at the time the railroad was completed, the contract provides that any amount thus paid in excess of the royalty on coal actually mined shall be applied in payment of that subsequently mined the following year in excess of the minimum royalty of $2,000.   By the terms of the contract any amount paid in excess of the royalty on the coal actually mined may only be applied in payment for that subsequently mined the following year in excess of $2,000.   If no coal is mined in excess of $2,000 no right accrues to the lessee to have any sum previously paid applied in payment of what is mined.

To hold that the word ''year'' in the contract means years would be to hold that the words, ''the year following,'' mean nothing and are superfluous; for the words ''subsequently mined'' would have meant that if nothing more had been added and would have included all the subsequent years of the lease.   The court cannot assume that words were asserted in such a carefully drawn contract idly in the absence of anything to show this.   To read words out of a written contract is simply to disregard the writing which the parties executed as the final evidence of the contract.   This the court cannot do unless warranted by other provisions of the writing.   The fact is here that this is what the parties really meant, for they

fixed a monthly minimum and then an annual minimum, thereby showing an intention to require of the lessee continuous diligence in getting out the coal. The limitation of his right to credit for a previous overpayment to the following year looks to the same end.

Under the contract for the first two years 18,000 tons of coal should have been mined. But less than this in fact was mined. In the next year only 13,781 tons were mined, which was less than the yearly minimum of 16,000 tons. The next year only 140.63 tons were mined. The next year, for the first time, there was an excess and there was a like excess in the next year. But the amount mined the third year was below the yearly minimum. To hold that a deficiency in any year might be made up by an excess in any subsequent year would be to ignore the plain intent of the contract to provide for continuous diligence in getting out the coal. For under this construction of the contract the lessee could mine as little coal as he pleased as long as he pleased and in the last year of his term claim credit for all the deficiency in previous years.

The first year in which there was an excess was the year from March, 1922, to March 1, 1923. There was an excess that year of 1,683.48 tons, and that at 12½ cents a ton was already paid for in the excess paid the previous year. The next year there was an excess of 4,604.24 tons, but there was no deficiency in the previous year to which this may be applied. For the next year from March 1, 1924, to March 1, 1925, there was a deficiency of 418.44, which at 12½ cents a ton must be applied in payment of the excess mined the next year. The total of credits to which the lessee was entitled was 1,683.48 + 418.44=2,-101.92 tons, at 12½ cents a ton, making $262.74.

Judgment affirmed.