BELLE M. ANDERSON, et al.,
                    *Plaintiffs and Respondents,*

vs.

THE UNITED COAL AND COKE COMPANY, a Corporation, et al., Defendants, and LAWRENCE L. LOECHNER,
                    *Defendant and Appellant.*

(No. 2455; Decided February 20, 1951; 227 Pac. (2d) 700.)

For Loechner, defendant and appellant, the cause was submitted upon the brief of John U. Loomis and James O. Wilson, both of Cheyenne, Wyoming .

For the plaintiffs and respondents the cause was submitted upon the brief of H. Glen Kinsley and James Munro, both of Sheridan, Wyoming.

540

OPINION

Blume, Justice.

This action brought by the plaintiffs against the defendants is an ordinary action to quiet title for the lands hereinafter mentioned, setting forth the ordinary allegations in such action. Most of the defendant made default. Judgment was entered against them quieting title to the land involved herein in the plaintiffs. The real controversy herein was with the defendant, Lawrence L. Loechner, who on December 9, 1948 filed an amended answer herein in which he alleged that he entered into a lease and option agreement with one J. E. Dodds,

trustee for the plaintiffs herein. This agreement, entitled "Lease and Option Agreement," was entered into between the parties on February 24, 1943 and specified that J. E. Dodds, trustee, as lessor, leased to Lawrence L. Loechner, lessee, the following described property:

"The Northwest Quarter (NW¼) of Section 33; the South Half (S½) and the Southeast Quarter (SE¼) of the Northwest Quarter (NW¼), and the Northwest Quarter (NW¼) of the Northeast Quarter (NE¼) of Section 28, excepting therefrom the C. B. & Q. Railroad right-of-way, all in Township 52, North, Range 75 West, in Campbell County, Wyoming, consisting of 640 acres more or less." The remaining provisions of the lease and option agreement are as follows, leaving out a few statements which are not of importance herein. For convenience the provisions will be numbered in paragraphs so that ready reference may be made thereto in the further discussion of this case:

"1. IT IS UNDERSTOOD AND AGREED that the primary purpose of this Lease and Option Agreement is to mine coal and to operate coal mining properties, including buildings, structures, railroad tracks, and sidings, incidental to the mining of coal, and that in that connection the Lessee is to have the exclusive mining rights to said property.

"2. IT IS FURTHER UNDERSTOOD AND AGREED, that this Lease and Option Agreement shall commence on the date of the execution of this Lease and Option Agreement, and shall continue until all of the commercial or saleable coal is exhausted, and it being further provided that said lease may be cancelled by the Lessee on ninety (90) days' written notice to the Lessor.

"3. IT IS FURTHER UNDERSTOOD AND AGREED, that as part of the consideration of said Lease and Option Agreement that the Lessee shall pay to the Lessor fifteen (15c) cents per ton of 2,000 pounds, railroad or truck records accepted, for each ton of commercial or saleable coal mined on said property; that an account-

ing shall be had and payment of said royalties shall be made by the 10th of each month for the coal mined the preceding calendar month, and said payments to be made to the Lessor at any place the Lessor shall designate in Campbell County, Wyoming or in Omaha, Douglas County, Nebraska.

"4. IT IS FURTHER UNDERSTOOD AND AGREED that the Lessee shall pay to the Lessor, as royalties, not less than the sum of ONE THOUSAND ($1,000) DOLLARS per month, and said payments to commence on the first day of June, 1943.

"5. IT IS FURTHER UNDERSTOOD AND AGREED, that said property shall be mined in a skillful and workmanlike manner.

"6. IT IS FURTHER UNDERSTOOD AND AGREED, that the Lessee shall furnish a bond to the Lessor in the sum of FIVE THOUSAND ($5,00) DOLLARS to guarantee all wage and labor claims which may or might become alien upon said property, or which the Lessor might or may be called upon to pay; Provided, however, that if the company who operates the mine does not post a bond for the payment of said claims and charges, then said bond shall be in the sum of TEN THOUSAND ($10,000) DOLLARS.

"7. IT IS FURTHER UNDERSTOOD AND AGREED, that all taxes assessed against said property shall be paid by the Lessee.

"8. IT IS FURTHER UNDERSTOOD AND AGREED, that if all of the conditions herein set out are not fulfilled, the Lessor shall have the right to cancel said lease and forfeit the Lessee's rights thereunder, provided however the Lessor shall give sixty (60) days' notice of said intention to cancel, within which time the Lessee shall have the right to fulfill said conditions and avoid the forfeiture.

"9. In case of default in any of the provisions of said Lease and in the event the Lessor shall exercise the right to declare said Lease terminated by reason of said default, all personal property owned by the Lessee on said premises and all of the Lessee's real property

acquired under the provisions of this Lease and Option Agreement shall be forfeited to the Lessor and shall be sold by said Lessor to the highest bidder, the proceeds of which are to be applied against the amount due by virtue of said Lease; the balance, if any, to be remitted to the Lessee, and that this provision shall have the same effect as a lien or mortgage.

"10. IT IS FURTHER UNDERSTOOD AND AGREED, that at the conclusion or termination of this lease, all structures located on said property, including any tipple tracks or permanent buildings are to become the property of the Lessor; the Lessor shall have the right of access to the property at any time he may request, and in case of purchase of part of the property, as provided in this Agreement, and the termination of the Lease as to the balance, then IT IS FURTHER UNDERSTOOD AND AGREED that the Lessee shall accord to the Lessor right-of-way from the out-lying unpurchased part to the railroad right-of-way.

"11. IT IS FURTHER UNDERSTOOD AND AGREED that the Lessee shall have an option to purchase said property for the consideration of TWO HUNDRED ($200) DOLLARS per acre, provided that said purchase shall be for not less than 160 acres, and the area taken shall be made up of unbroken contiguous forties, and which area shall include the area already mined, said option to remain in full force and effect during the life of said lease.

"12. IT IS FURTHER UNDERSTOOD AND AGREED, in connection with the purchase price, that all royalty payments made under this Lease and Option Agreement shall apply on said purchase price, and payment in the event of sale shall be paid in amounts not less than would have been due if royalty payments had continued, with the provision, however, that the Lessee shall have the right and privilege to pay as much more as he desires, or to pay the entire purchase price at the time of the execution of a deed; that said conveyance shall be by Warranty Deed."

The defendant Loechner further alleged that the plaintiffs have accepted a sum of money in excess of $32,000;

that he notified plaintiffs of his acceptance of the option mentioned in the lease but that plaintiffs have failed and neglected to execute a deed to him; that after the first notice of acceptance given by him, plaintiffs attempted to cancel the contract; that he exercised his option as to 160 acres of land, which he describes and will be mentioned later in this opinion; that after receiving notice of cancellation, the defendant had again advised the plaintiffs that he had accepted the said option and had fulfilled its terms, and again demanded a deed to the land hereinbefore described, but that the said plaintiffs have wholly failed and refused to recognize the option and carry out its terms; that because of the failure of the plaintiffs to carry out the terms of said option and to comply with said contract, it has been impossible for this defendant to continue his operations upon the lands. He therefore demanded judgment that plaintiffs execute to him a warranty deed conveying the 160 acres to him.

Plaintiffs in reply to the answer of Loechner alleged that the lease and option agreement referred to in the answer of Loechner was cancelled by the plaintiffs on October 11, 1946 for the reason that Loechner had wholly failed to carry out and perform the terms and conditions of said lease; that Loechner had failed to pay the property taxes against the real estate in the amount of about $185.58; that he failed and refused to pay the minimum of $1,000 per month as required by the terms of the agreement; that on the date of the attempted exercise of the option he failed to pay the royalties on coal mined from the premises to that date, and then was in default thereof; and ever since has been, and is now in default thereof; that he failed to give the bond required in the agreement.

In a counter-claim the plaintiffs allege the execution of the lease and option agreement hereinbefore men-

tioned; that Loechner agreed that he would pay a minimum monthly royalty of $1,000 commencing on the 1st day of June, 1943 which was under the terms of the agreement modified so as to commence on November 1, 1943. Plaintiffs set out a table of the monthly rentals falling due under the agreement, the amounts paid and the deficits in payment. For convenience this table is designated herein as: *A TABLE OF PAYMENTS AND DEFICITS and is as follows:*

| | Due Per Mo. | Paid Per Mo. | Deficit |
|---|---|---|---|
| Nov. 1943 | $ 1,000.00 | $ 1,500.00 | $ |
| Dec. 1943 | 1,000.00 | 6,000.00 | |
| Jan. 1944 | 1,000.00 | 5,959.50 | |
| Feb. 1944 | 1,000.00 | 3,620.55 | |
| Mar.-Aug. 1944 (6 mos.) | 6,000.00 | | 6,000.00 |
| Sept. 1944 | 1,000.00 | 977.31 | 22.69 |
| Oct. 1944 | 1,000.00 | 1,842.60 | |
| Nov. 1944 | 1,000.00 | 2,097.38 | |
| Dec. 1944 | 1,000.00 | 3,102.60 | |
| Jan. 1945 | 1,000.00 | 1,982.25 | |
| Feb. 1945 | 1,000.00 | 1,800.00 | |
| Mar. 1945 | 1,000.00 | 1,302.45 | |
| Apr. 1945 | 1,000.00 | 1,468.44 | |
| May 1945 | 1,000.00 | 444.46 | 555.54 |
| June-Nov. 1945 (6 mos.) | 6,000.00 | | 6,000.00 |
| Dec. 1945 (Coal sold to Horning-Ross; 7836.90 tons) | 1,175.84 | | 1,175.84 |
| Jan. 1946 (Coal sold to Horning-Ross; 1947.47 tons) | 1,000.00 | | 1,000.00 |
| Feb. 1946 (Coal sold to Horning-Ross; 951 tons) | 1,000.00 | | 1,000.00 |
| Mar.-May, 1946 (3 mos.) | 3,000.00 | | 3,000.00 |
| TOTALS | $31,175.84 | $32,097.54 | $18,754.07 |

Plaintiffs further alleged that there is due to plaintiffs from the defendant up to the month of October, 1946 when plaintiffs cancelled the lease, the sum of $23,-254.07; that in case the court should determine that Loechner had lawfully exercised the option to purchase 160 acres of land, that then it should be declared that he is indebted to the plaintiffs in the amount above mentioned, and that an accounting be had in that connection. Loechner filed a reply to the counter-claim denying the allegations therein. In the trial of the issues the court found for the plaintiffs and quieted title to the property in them against Loechner and from that judgment the latter has appealed to this court. He will generally be referred to herein by name or as the appellant.

It was agreed on the trial of the case that Loechner paid in as royalties the sum of $32,097.54 as set out in the foregoing table of payments and deficits. It appears that J. E. Dodds died sometime in December, 1945 and that the plaintiffs are his successors in interest in the land. Harry L. Welch, who was appellants' attorney, testified that on May 29, 1946 he mailed a letter to all of the plaintiffs notifying them that Loechner exercised the option mentioned in the lease. He described the land as follows: The Southeast Quarter (SE¼) of the Northwest Quarter (NW¼); the Southwest Quarter (SW¼) of the Northeast Quarter (NE¼); the Northeast Quarter (NE¼) of the Southwest Quarter (SW¼); the Northwest Quarter (NW¼) of the Southeast.Quarter (SE¼) of Section 28, Range 75 West 6th P.M., Campbell County, Wyoming. He stated that the option was exercised by virtue of the lease and option agreement entered into on the 24th day of February, 1943, which lease and option agreement was in respect to the following described property. (Here the 640 acres mentioned in the lease and option agreement were described in full). It may be here noted that in the notice

no township is mentioned and, further, that the Southwest Quarter (SW¼) of the Northeast Quarter (NE¼) of Section 28 is not contained in the lease and option agreement, but that the Northwest Quarter (NW¼) of the Northeast Quarter (NE¼) was probably intended. The letter of Mr. Welch states in part: "In connection with the description of the property upon which we are exercising the option, you will recall when you were in my office before that I pointed out these four quarter quarters which contained the property that was being mined. I have mislaid the map and, therefore, we would like to reserve the right to correct this description in the event that the description is not the four quarters in which mining operations have been conducted." The correction was never made. The letter containing the exercise of the option was not, if sent at all, sent by registered mail, and the plaintiffs all testified that they did not receive the letter. While there was some correspondence with a few of the plaintiffs thereafter, and some activities apparently relating to the exercise of the option took place, these matters are left uncertain in the record and do not definitely at least, indicate that the letter was sent.

On October 11, 1946 Paul Ferguson, on behalf of the plaintiffs, mailed a registered letter to the appellant Loechner cancelling the lease on account of default therein in the payment of the minimum royalties and other defaults. The receipt of the letter by Loechner is not disputed. Ferguson further testified that he and one Mr. Jones met in Mr. Welch's office in Omaha and that the appellant Loechner was present at that time. Question 147 is as follows:

"Q. What, particularly, was said on that date at that time and place respecting this cancellation?

"A. Well, it was agreed and after we had discussed this matter at some length that Mr. Loechner was will-

ing to cancel this lease. He was being sued out here, and he couldn't go on with the lease and operate the mine and he said he was willing that a cancellation be perfected."

This testimony is not denied, but is seemingly construed by appellant as referring only to land other than that sought to be taken under the option. When Paul Ferguson got home to Shenandoah, Iowa, he felt that perhaps the notice sent by him did not definitely terminate the lease as of its date, in view of the fact that the lease provided that Loechner should have 60 days after notice of the cancellation to purge any default. So he wrote Mr. Welch in reference to that. On October 14, 1946 Harry L. Welch answered the letter as follows:

"Mr. Paul Ferguson
Attorney at Law
Suite 206 Rankin Block
Shenandoah, Iowa
Dear Mr. Ferguson:

Mr. Lawrence Loechner advised me that he is in receipt of your notice of cancellation, and requests me to acknowledge receipt thereof.

There is a provision in the lease for a sixty-day notice of either party to cancel. Under the circumstances, we feel that there is no chance of complying with the terms of the lease, and, therefore, there is nothing we can do except waive that notice.

We, therefore, advise you that we are waiving the notice.

Yours very truly,
GROSS & WELCH
/s/ Harry L. Welch."

The appellant denied that he gave Welch any authority to write this letter.

Thereafter, and sometime in the month of November the appellant Loechner wrote a letter to the plaintiffs herein advising them that he had exercised the option according to the letter of Mr. Welch dated May 29, 1946.

This letter was mailed by registered letter to each of the plaintiffs and the testimony shows that they received it. It enclosed a copy of the letter which Welch claimed to have sent. Nothing was done by any of the parties to this action thereafter until July 19, 1948 when the plaintiffs herein brought the action to quiet title as hereinbefore mentioned. While some of the matters here mentioned seem to be immaterial, we have thought it best, for a fuller understanding, to set out the substance of the facts appearing in the record. A few additional facts will be mentioned later.

The lease in Paragraph 11 required any option to purchase to be of not less than 160 acres which should be contiguous and include (embrace?) area already mined. Counsel for the plaintiffs contend that the notice to exercise the option was too indefinite to warrant a court in granting specific performance of the option. As heretofore noted, the letter under which the option was sought to be exercised failed to describe 160 acres properly, in that a township was not designated therein. We think this mistake would make no difference for the reason that reference was made to the description of the 640 acres of land in the lease, in which the township is designated, so that the court could not possibly be misled. One forty-acre tract designated in the letter was, as already stated, erroneously described. However, the lease does not specifically state that the optionee was required to specifically designate the land to be included therein. We have before us an action in equity. Perhaps—without deciding the point—the court could have assigned the land to be purchased, provided that it were shown as to what tracts had been mined. The testimony of Welch (Question 48) indicates that the land sought to be purchased was land on which mining had been done. Hence, if it clearly appeared that aside from the points here discussed, appellant would be entitled to the relief sought by him, this court—without

deciding the point—should perhaps, so that no injustice could result, send the case back for any necessary correction of the matter which, at most, appears to be probably technical. So, we shall proceed to consider the points of vital importance herein.

Counsel for appellant seem to be under the impression that when the latter paid $32,000 in any manner and at any time, he could buy 160 acres—the best part perhaps of the land—have that free and clear by merely paying 15 cents per ton of coal mined, without any further obligation whatever to the lessor, permitting him as he pleased to shut down the mine and go on his way. If he could do that he would perhaps have had a good bargain, commensurate with the amount of coal still under the land. We think, however, that such a construction of the lease is a mistaken one. The lease was to last until all the coal would be mined. (Paragraph 2 of the lease.) During its continuance, lessee agreed to pay a minimum royalty of $1,000 per month. (Paragraph 4.) There is nothing in the lease which intimates that lessee would be released from that obligation if and when he should buy 160 acres of the land. That obligation would continue to the time when the lease would be terminated. The lease gave the lessee the right to cancel the lease upon three months' notice. (Paragraph 2 of the lease.) And it may be that after having bought the land as contemplated by the lease, he might then have terminated it by paying a minimum royalty of $1,000 per month for three months or $3,000 additional. We need not determine that point but that was, in any event, the minimum he would have had to pay for his bargain, and there is doubt that even that was the intention of the parties. Counsel for appellant say: "He (appellant) did pay $32,000 in royalties and thereby became entitled to 160 acres of lands including and surrounding the mining lands involved. It would be inequitable to require him

to pay royalties (payments for coal mined) minimum or otherwise, on lands to which he had become thus entitled." There might be force in this contention—assuming that appellant was not in default—if the lease were confined to the 160 acres of land which appellant was entitled to purchase, but the lease includes 640 acres and, so far as the record shows, there is no reason why he, after having properly purchased his 160 acres, could not have mined coal from the balance of the land included in the lease so as to meet the minimum royalties agreed by him to be paid.

Counsel for appellant say: "It is not shown that when the lessee had paid $32,000 in royalties he was substantially in default as we view the situation." The record shows that appellant failed to pay the sum of about $185.58 as property taxes. Counsel for appellant say on this point: "The total of all such surface taxes was relatively insignificant." Possibly so if the default in this respect stood alone, although we need not decide the point. The record further shows that appellant never furnished the bond which he agreed to furnish. (Paragraph 6 of the lease.) Counsel on that matter say: "There is no evidence that the performance bond referred to was insisted upon by the lessor, or by the same token that it was considered important." It is true that there was no evidence produced on this matter. For aught we know, Dodds may have, time and time again, urged the appellant to furnish the bond. The record shows that one of the defendants in this case claimed at one time a lien on the property here involved in the amount of $33,603.66. The lien was apparently not enforced. Still, counsel can hardly be correct in saying that the matter was of no importance. If the furnishing of the bond was waived, the burden of proof in that connection was on the appellant. 67 C. J. 309. We need not determine whether default in this respect alone was

fatal. Counsel for the appellant further seem to be under the impression that deficits in the minimum payments in 1945 and 1946 make no difference in this case; that the amounts paid in the months from November, 1943 to January, 1945, all of which were larger than $1,000, took care of the deficits in the later months up to July 1, 1946. We think that counsel are mistaken. Paragraph 4 of the lease provides: "IT IS FURTHER UNDERSTOOD AND AGREED that the lessee shall pay to the lessor, as royalties, not less than the sum of ONE THOUSAND ($1,000) DOLLARS per month." Here a minimum monthly payment is required; that means a payment of $1,000 each month. 48 C. J. 806 under "Per." That provision is succinct, specific and in no manner qualified or modified by any other provision in the lease. Provisions for minimum payments are very common in mineral leases, although generally much more elaborate than the precise and unqualified and unmodified provision in the lease involved in the case at bar. See Decennial Digest under Mines and Mining, Section 70, Subdivisions 1 and 2. Such provisions are inserted in order to compel the lessee to be diligent and prompt in the development of the mine. Nelson vs. Iron and Steel Co., 240 Fed. 285, Diamond Iron-Min. Co. vs. Iron-Min. Co., 70 Minn. 500, 73 N. W. 507, Lehigh Valley Coal Co. vs. Everhart, 206 Pa. 118, 55 Atl. 864. The provision in that connection in this case was inserted, partially at least, so as to ultimately provide an income to the lessor, if possible, of $128,000, not $32,000. It is stated in 58 C. J. S. 400: "It is usual for mining leases, especially in the coal mining regions, in reserving a royalty to the lessor to contain a provision for the payment to the lessor of a sum variously known as a 'minimum royalty' or as a 'dead' or 'sleeping' rent, that is, to fix a minimum amount to be mined or a minimum royalty to be paid in any event within certain fixed periods, in which case the amount so fixed must be paid,

although no mining is done or the royalty at the agreed rate on what is actually mined is less than the minimum, such royalty being considered liquidated damages and not a penalty." The text is supported by numerous cases cited in 40 C. J. 1029. See also 36 Am. Juris. 314. In Allendale Land Co. vs. Alabama By-Products Corp., 237 Ala. 598, 188 So. 256 the court stated that "the primary purpose of minimum royalties is to assure the lessor a stated income from the lease." Snyder on Mines (1902) Section 1260 states: "It will thus be seen that, as a general rule, all leases or licenses contain a provision for minimum royalty or dead rent or sleeping rent, and it may be said in passing that dead rent and sleeping rent in this country, as also minimum rent, as used in some of the leases, mean the same as dead rent as understood in England. By whatever name it is called, it means a fixed sum or amount which must be paid at all events, even though the royalty is paid on the basis of the product. The payment of this sum, however, does not necessarily satisfy the rent and royalty in any event, the general rule being that the lessee must pay for the product actually marketed, even though it reaches beyond the amount of minimum royalty or dead rent."

Whether or not, when coal was mined in any previous month or months, which at 15 cents per ton produced more than $1,000 should be credited on the minimum royalty of a succeeding month or months, depends on whether or not the provisions of the lease so state. No provision to that effect is found in the lease involved in the case at bar, and cannot be read into it. The lease does not say that coal should be mined, which *on an average* should produce $1,000 per month; the lease permits the lessee to mine as much coal as he pleased; but he must in any event pay $1,000 each month; if he mined coal producing at 15 cents per ton, more than

that amount, he must pay that; if he mined less, he still had to pay $1,000 per month. We cannot see how that could have been made clearer. In Elkhorn Coal Corporation vs. By-Products Coal Co., 237 Ky. 436, 35 S. W. 2d 898 the court stated: "The minimum royalty is a primary obligation of the lease, designed to serve as rental for holding the lands for the purposes of the lease, whether or not any coal should be actually mined. * * * *No credit against the minimum royalty may be made, except as authorized by and in accordance with the lease.* * * * The minimum royalty is really a yearly rental for the leasehold. It must be paid at all hazards, if the lease is kept alive. * * * It was not merely the purpose of the lease to realize the sum of 15 cents per ton to the lessor for all its coal. * * * That construction would nullify some of the terms of the lease. The lessor expected and exacted careful and efficient mining and had a right to impose terms tending to achieve that object. The omission to provide for credit against the minimum royalties of any damages paid for lost coal was not accidental. Nor does the lessor get paid twice for the same thing. The damages specified pays only the royalty value for coal lost. The minimum royalty pays for holding the entire premises under the lease. Koppers Co. vs. Asher Coal Mining Co., 226 Ky. 492, 11 S. W. 2d 114." (Italics supplied). Corona Coal Co. vs. Hendon, 214 Ala. 139, 106 So. 855 and Vandalia Coal Co. vs. Underwood, 55 Ind. App. 91, 101 N. E. 1047 clearly hold, we think, that under a lease such as before us, amounts paid in previous months in excess of the minimum royalty due in any one month, cannot be applied so as to avoid the requirement that the minimum amount of royalty provided for in the lease must be paid in any event in subsequent months. Both of these cases were actions to recover amounts due on the minimum royalty. In both cases the appellants contended that the lease should be construed as providing an average mini-

mum royalty, but the contention was rejected both by the lower and the appellate courts. A number of cases have considered the reverse of the foregoing situation, namely one in which in previous months or years the coal mined at, say, 15 cents a ton would not equal the minimum royalty required to be paid, but which was paid. Then in succeeding months or years more coal was mined than that which at, say, 15 cents per ton, would pay the minimum royalty provided in the lease, and it was sought to recoup the loss of the preceding months or years, by applying the amount realized over and above the required minimum to the loss of the preceding months or years. In each of these cases, in the absence of a provision that this might be done, this was not permitted, the courts holding that the minimum royalty provided in the agreement for each year or month was independent of the payment made in any other year or month. Minnehaha Land and Investment Co. vs. Consolidated Sand & Stone Co., 64 S. D. 48, 264 N. W. 198, Greenough vs. Colonial Colliery Co., 132 Pa. Super. 270, 1 Atl. 2d 174, Woodruff vs. Gunton, 222 Pa. 384, 71 Atl. 851. In the last of these cases, the court stated: "Whether the privilege to mine a certain amount of coal, in consideration of the payment of an annual royalty or rent, is exercised or not, the covenant of the lessee is to pay a fixed sum for the privilege. If the amount of coal which the lessee is permitted to mine in each year is not mined, there is no stipulation for a proportionate abatement of the annual royalty, nor is a privilege given to him to recoup himself, after having paid such royalty, by mining the deficiency in a subsequent year without paying therefor. Such was the privilege in the leases under consideration in Lehigh & Wilkes-Barre Coal Company v. Wright, 177 Pa. 387, 35 Atl. 919, Lehigh Valley Coal Company v. Everhart, 206 Pa. 118, 55 Atl. 864, and Pennsylvania Coal & Coke Company v. Witherow, 215 Pa. 327, 64 Atl. 535, but the

express covenant of the present lessee is that for each year, and in each year, he will pay a fixed sum, and in addition thereto 25 cents for every ton of coal mined in excess of what he is permitted to mine in consideration of the payment of the fixed sum. The payment of the royalty or rental for each year is independent of the payment in any other year, and the mining of the coal each year is independent of the mining in any other year." If that is true in such a case, it must also be true in cases such as that at bar, in which the payments in previous months were larger than the required minimum. In such case, too, the minimum royalty provided in the lease, in the absence of an agreement to the contrary, is independent of the payment made in any previous month or months. We rather suspect that appellant was not altogether unaware of this rule of law, or perhaps surmised that this might be the rule of law, for he waited for at least a whole year after ceasing to pay royalty before he attempted to exercise the option in the lease, and that after the death of Dodds, the original lessor. By examining the table of payments and deficits hereinbefore set out, it appears that even though the appellant exercised the option on May 29, 1946, he was in default in the payment of approximately $18,000, and if the option was not exercised until November of that year, he would have been in default in the payment of some $5,000 more.

What was the effect of these defaults? An annotation on the subject is contained in 115 A. L. R. 376 to 385. It is stated in 32 Am. Juris 286: "The determination of whether a breach of the lease renders an option to purchase nugatory depends on whether the option and lease are one agreement or are independent. This resolves itself into a problem of construction of the instrument and of determining the intent of the parties." The case of Simmerman vs. Fort Hartford Coal Co., 310

Ky. 572, 221 S. W. 2d 442 considers a lease very similar to the lease in the case at bar except that there had been no default in the payments of the lease in that case. The court stated among other things: "The contract cannot be separated into two distinct parts. It may be that appellee would not have leased the coal and agreed to pay royalties but for the option to purchase and to have these royalties applied to the purchase price, as the president of appellee company testified he would not have done. Therefore the lease and the royalties to be paid thereunder and the option to purchase all the coal including the coal which had been taken, by surface measurements, and the application of royalties on that which had been taken to the payment of the purchase price, constitute one contract supported by consideration." See also Thompson vs. Coe, 96 Conn. 644, 115 Atl. 219, 17 A. L. R. 1233, Helbig vs. Bonsness, 227 Wis. 52, 277 N. W. 634, 115 A. L. R. 373. In the case at bar the option lasted only as long as the lease was in force and effect. The land permitted to be purchased under the option was to be paid for out of royalties and, we think, accordingly, that the agreement as to the option was not independent but was one indivisible agreement along with the other provisions in the lease. Hence, it would seem that the rule stated in 12 Am. Juris. 881 is applicable and which is as follows: "If the promises are independent of each other, a party must perform his part of the contract when the time for performance has arrived, irrespective of whether the other party has performed his obligation; if, however, the promise of one is dependent upon performance by the other, the former need not perform unless the other has performed or at least offered to perform his part of the contract. In the case of concurrent obligations the party seeking the legal enforcement of the stipulations of the other must first show a compliance with his own. On principles of general justice, if the acts are to be

done at the same time, neither party to such a contract can claim the fulfillment thereof, unless he has first performed or is ready to perform all the acts required on his own part." To the same effect is 17 C. J. S. 932-934. In 32 Am. Juris. 279 it is said: "Where a lease and option to purchase contained therein rest upon a common and indivisible consideration, when the lease falls the option goes with it." See also Bond vs. Long, 338 Ill. App. 1, 86 N. E. 2d 585. In the case at bar the appellant, whether he exercised the option May 29, 1946 or later, had not performed his contract, nor did he offer to do so. And it would seem accordingly that he has no standing in court.

What has heretofore been said is emphasized, and its correctness proven, we think, beyond cavil by a specific provision in the lease. Paragraph 12 provides: "IT IS FURTHER UNDERSTOOD AND AGREED, in connection with the purchase price, that all royalty payments made under this lease and option agreement shall apply on said purchase price, *and payment in the event of sale shall be paid in amounts not less than would have been due if royalty payments had continued,* with the provision, however, that the lessee shall have the right and privilege to pay as much more as he desires, or to pay the entire purchase price at the time of the execution of a deed." (Italics supplied). We are here dealing with the italicized portion. It was crudely drawn, but it was inserted for some purpose, and the meaning of it is, we think, clear. Payment at the time of the exercise of the option must be made in amounts not less than would have been due if royalty payments had continued. In other words, appellant was compelled under this provision to purge any default which existed at the time of the exercise of the option and pay whatever amount still remained due under the provisions of the lease. This he did not do. And so as already

stated, he had no standing in court asking it to compel the plaintiffs to make conveyance to him of any property. This determination makes it unnecessary to consider other points in the case and the judgment of the trial court is accordingly affirmed.

*Affirmed.*

KIMBALL, C. J., and RINER, J., concur.