**CARTER et al. v. CERTAIN-TEED PRODUCTS CORP.**

No. 14577.

United States Court of Appeals Eighth Circuit.

Jan. 20, 1953.

Rehearing Denied Feb. 17, 1953.

Alan Loth, Fort Dodge, Iowa, for appellants.

A. B. Howland, Des Moines, Iowa, and Norman A. Miller, Chicago, Ill. (Gamble, Read, Howland, Gamble & Riepe, Des Moines, Iowa, and Clausen, Hirsh & Miller, Chicago, Ill., on the brief), for appellee.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

On petition for rehearing, original opinion withdrawn and modified as follows.

COLLET, Circuit Judge.

This action involved the construction of a lease given by plaintiffs-appellants[1] to defendant-appellee[2] for the quarrying and mining of gypsum rock on plaintiffs' land near Fort Dodge, Iowa. The details of the transaction, many pertinent provisions of the lease, and the respective contentions of the parties concerning its meaning and proper construction are set out in the memorandum opinion of the trial court, Carter v. Certain-Teed Products Corp., D.C., 102 F.Supp. 280. We will repeat here only so much as may be necessary to an understanding of our conclusion.

At the outset it should be stated, in explanation of our consideration of many facts and circumstances detailed in the evidence which occurred both before its execution and during the continuation of the lease, that its meaning is sufficiently ambiguous to justify the consideration of parol evidence and extraneous circumstances in determining its meaning.

Defendant owned a plant near Fort Dodge, Iowa, where it manufactured gypsum products from gypsum rock. Plaintiffs owned 80 acres of land near Fort Dodge, underlaid with extensive gypsum rock deposits. Defendant had no source of gypsum in 1945 for the operation of its plant.

1. Referred to hereafter as plaintiffs.

2. Hereinafter referred to as defendant.

Plaintiffs approached defendant concerning the lease of its land to defendant for the extraction of gypsum rock. Negotiations resulted in the execution of an option and soon thereafter in the lease now in question, dated September 24, 1945. In the preliminary negotiations plaintiffs undertook to obtain a royalty agreement which would provide for a minimum annual royalty of $15,000, payable monthly. They were represented by competent counsel and defendant was represented by its president. Defendant demurred from such an arrangement on the ground that the future of its plant at Fort Dodge was not certain and that it should not obligate itself to pay a guaranteed annual minimum sum regardless of the actual needs of its plant. The result was that the lease, when executed, provided for the payment of an advance cash royalty of $25,000 and a royalty of 10 cents per ton for all gypsum quarried and removed. The payments of 10 cents per ton were not to begin until enough gypsum had been quarried for the royalty thereon at that rate to equal the $25,000 advance payment. The lease further provided that:

"(a) Defendant * * * 'will quarry * * * the real estate in a workmanlike manner * * * so long as quarrying operations can be done on an economical basis;'

"(b) Defendant must 'as rapidly * * * as conditions permit, and in any event not later than January 1, 1947, extract not less than 60% of the gypsum * * * rock requirements for * * * (its) gypsum plant in Fort Dodge, Iowa, from said real estate; and will continue to do so as long as there is sufficient gypsum * * * to supply said 60% of said requirements.'

"(c) When defendant commences to quarry, it must 'do so and continue to do so' by customary methods; these may destroy the surface of the ground, 'in consideration of the royalty payments provided for herein.'

"(d) 'All royalty payments * * * shall be made on or before the 15th day of each month during the term of this agreement * * * based on the quantity of gypsum * * * quarried and removed during the previous period of one month.'

"(e) Defendant must keep complete records of gypsum quarried and removed, which shall be available to us for inspection, for two expressed purposes: (1) 'to determine the amount of said royalty payments' (i. e., the monthly payments in clause 6); and (2) to 'determine whether at least sixty per cent of lessee's gypsum * * * requirements, as herein set forth, are being extracted from said real estate.'"

Equipment to quarry the gypsum was not available to defendant at that time because of the war. It employed a contractor who had the necessary equipment and heavy machinery. Production began in March, 1946, and continued at a rapid pace until September, 1947, when the contractor's services were terminated. During that time 464,542 tons had been quarried and paid for. One hundred per cent of the requirements of defendant's plant during that period was 270,255 tons, leaving a very substantial stock pile for future use at the plant. Equipment was still not available and the plant's requirements were met from the stock pile for 17 months, until March, 1949.

In 1947 defendant leased an 80-acre tract known as the Steiner property, which adjoined plaintiffs' land on the north. This lease provided for a guaranteed annual royalty of $1,200.00, 10 cents per ton on all gypsum removed and that at least 20% of the requirements of the Fort Dodge plant would be taken from the Steiner property during the term of the lease which was, like plaintiffs' lease, for a period of ten years with an option of renewal for successive ten-year periods. The $1,200.00 guaranteed annual royalty was to be applied to the 10-cent royalty until enough gypsum had been removed at 10 cents per ton to equal all guaranteed annual royalty payments which had theretofore been made during the entire term of the lease.

In February, 1949, defendant obtained proper equipment and renewed quarrying operations on plaintiffs' property in March, 1949, which were continued through September and part of October, 1949. In October, 1949, it began production from the

Steiner tract. From that time on until this suit was filed in September, 1951, quarrying operations were carried on intermittently on plaintiffs' tract and the Steiner tract. The Fort Dodge plant was operating steadily and continuously during all this time. The result was that either on a monthly or annual basis during much of the period from the date the contractor discontinued operations less than 60% of the gypsum requirements of the Fort Dodge plant was taken from plaintiffs' tract. But at no time since the commencement of quarrying operations in March, 1946, did the overall amount taken from plaintiffs' property drop below 60% of the previous total requirements, on any given date, of the Fort Dodge plant.

It is plaintiffs' construction of the lease that defendant must take each month 60% of the requirements of the Fort Dodge plant for that month, and if it does not take that much each month it must nevertheless pay for that much. Their present action seeks a declaratory judgment and prays for that construction. They further seek an accounting and payment for such part of 60% of the amounts used at the plant during each month which was not taken from plaintiffs' tract. They further seek a cancellation of the lease because of its breach by defendant. The trial court found there had been no breach of the lease by defendant, that defendant had taken approximately 75% of all gypsum used at the Fort Dodge plant up to the time this suit was filed from plaintiffs' tract and paid for it,[3] and consequently owed plaintiffs nothing. It thereupon dismissed plaintiffs' complaint.

Plaintiffs' contention that defendant is required to take from their property and pay for *each month* an amount of gypsum equal to 60% of the plant requirement for that month is based upon the premise that there should be read into the lease an implied warranty that defendant must do so in order to protect plaintiffs in receiving a regular monthly income instead of sporadic payments in larger sums. They cite Freeport Sulphur Co. v. American Sulphur

Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 1041, 60 A.L.R. 890. In that case the Texas Supreme Court states the law of implied covenants in relation to royalty provisions in conveyances of mineral rights as follows:

"The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made. Before a covenant will be implied in the express terms of a contract, and in some cases in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole." Citing Grass v. Big Creek Development Co., 75 W.Va. 719, 84 S.E. 750, L.R.A. 1915E, 1057, and 15 C.J., p. 1214; 21 C.J.S., Covenants, § 14.

The Supreme Court of Texas noted that there seems to be no obligation implied in England to work a mine merely because a royalty is reserved, but that—"the American courts have liberalized the rule, especially in sales of minerals and mineral rights in oil and gas leases, and have found an implied covenant for diligent and reasonable development and operation in leases which make the lessor's compensation depend upon development and operation." In the Freeport case the only express provision indicative of an intent that sulphur ore should be mined steadily was that the lessee (purchaser of the land in that instance) agreed to erect a one-unit plant on the property within a year. The parties entitled to the royalty, on a per ton basis of ore removed, insisted there was an implied cov-

---

3. The fact that 75% of all gypsum used at the plant up to the time of the filing of this suit was taken from plaintiffs' tract is not disputed.

enant to develop the mining operations to the fullest reasonable extent and that the provision for the erection of the plant was only for the purpose of testing the ore and that full reasonable production was not to be measured by the capacity of the one plant. Other plants had been erected which permitted the production and use of much greater quantities of ore than the one provided for in the contract. The lessee (purchaser) discontinued production entirely for substantial periods of time and asserted the right to discontinue entirely under the contract. The court held that there was no implied warranty for full and general development, because the provision for the erection of a one-unit plant was an express provision for development, and negatived an implication for full development. It quoted with approval from Merrill's "Covenants Implied in Oil & Gas Leases":

> "It is elementary that an express stipulation upon a matter excludes the possibility of an implication upon the same subject."

But the court did hold that there was an implied covenant of and for reasonably diligent development and production, to be measured by:

> "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required." Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, 814.

In rejecting the lessee's contention that since it had produced and stock-piled large quantities of sulphur, reasonable diligence would still permit it to shut down for the period complained about, the court held that under the circumstances the question of whether reasonable diligence had been practiced was one of fact for the triers of the facts.

A number of other cases are cited on the question of implied covenants. But the Freeport case sufficiently illustrates the applicable law on the subject, making unnecessary a discussion of the others.

█ In the case before us the contract expressly geared the amount of gypsum to be removed and paid for to 60% of the plant's requirements. In doing so it excluded an implication that more than that amount was to be taken in any given period, whether such period be a month, a year, or the full term of the lease. The lease does not contain any provision which expressly or by reasonable inference requires defendant actually to take each month 60% of the gypsum used in the plant that month, and we may not read such a provision into it.

Consequently, defendant had not breached the contract but will breach it if at any time, whether it be for a month or a year or for any other period, it has not taken 60% of the current and past requirements of the plant.

Plaintiffs present several arguments which we should allude to. It is asserted that the lease should be construed as a whole and to give effect to each term in the light of all others. That cardinal rule of construction is so well established that its correctness cannot be questioned. That it should be construed according to the nature and purpose of a mineral lease is also correct.

█ Plaintiffs say that the language of the lease should be construed against the lessee and especially against any result making it the arbiter of when or how much it must operate. The lease was prepared by both parties dealing at arm's length, after careful consideration, with expert legal advice to plaintiffs and extensive exchange of suggested language. The circumstances are such that, as the trial court concluded, the rule that an ambiguous instrument will be construed unfavorably to the party who prepared it has no application.

That the lease should be, as plaintiffs contend, construed in the light of the circumstances attending its creation and to conform with applicable rules of law unless it negatives them explicitly, we agree.

Plaintiffs say that the lease contains a minimum royalty formula, that the law applicable to mineral leases with minimum royalties should be applied, and that mineral leases with minimum royalties never allow the lessee to credit payments first made, above the minimum, against later minimum

requirements, unless the lease so specifically provides. Upon that theory they say that this lease should not be construed to permit the removal and payment for 60% of two months' requirements of the plant in one month and the removal of none the next month, without paying for 60% of the gypsum used in the plant the second month, in addition to the amount paid the preceding month. Cases such as Babcock Coal & Coke Co. v. Brackens Creek Coal Land Co., 128 W.Va. 676, 37 S.E.2d 519, 163 A.L.R. 871; Elkhorn Star Coal Co. v. Hall, 222 Ky. 345, 300 S.W. 864; Anderson v. United Coal &. Coke Co., 67 Wyo. 536, 227 P.2d 700; Elkhorn Coal Corp. v. By-Products Coal Co., 237 Ky. 436, 35 S.W.2d 898; and Hamden Holding Corp. v. United Men's Shops, 127 Conn. 500, 18 A.2d 356, are cited in support of that position.

The lease does provide for a minimum royalty, expressly stated—60% of the plant's requirements—not the kind plaintiffs contend. If the lease had required the production of and payment for a stipulated minimum number of tons per month without any stipulation for a "carry over" from one month to the next, those and similar cases cited would be applicable and would require the payment of the stipulated sum each month. But, although the present lease does provide for a minimum royalty by providing that defendant should take 60% of the plant's requirements, there is no provision in the lease which requires defendant to take 60% during any stated period of time. We have construed the lease to require defendant to take a sufficient quantity to constitute 60% of the plant's requirements *all of the time the lease is in force,* which of course precludes the possibility that future excesses over the 60% requirement be contemplated as an offset against past deficiencies, but there is no basis in the language of the lease or in the necessities of the situation in the interest of fairness to the parties for construing it to mean that any month or any year should be treated as a separate unit of time within which any particular number of tons should be quarried and paid for. The fact that settlements are to be made each month is relied upon by plaintiffs to support their construction that each month should be treated as a separate time unit. But we find nothing in the lease to justify that construction.

It is further argued that if the lease does not afford a minimum royalty, it should be construed to demand a continuous operation (while defendant's plant requires gypsum) to the 60% required, rather than to permit defendant to interrupt that continuity because it had taken more than 60% earlier. That argument assumes that which does not exist, i. e., that there is an implied covenant to continuously operate the quarry rather than the plant. We have heretofore pointed out that there can be no implied covenant with respect to that about which there is an express provision. The lease expressly provides for the operation of the quarry to the minimum of 60% of the plant's requirement.

It is our judgment that the trial court should have, under the circumstances, entered a judgment declaratory of the rights of the parties under the lease instead of dismissing the complaint. We agree that there has been no forfeiture of the lease by defendant and that defendant is not in arrears on its royalty payments. The claims plaintiffs make in that regard were properly dismissed. But plaintiffs, and defendant also, are entitled to have the judgment authoritatively adjudicate their rights and responsibilities under the lease. Our opinion concerning those rights and responsibilities will furnish adequate guidance for the modification of the judgment.

The cause is remanded with directions to modify the judgment in accord with this opinion.

A majority of the court are of the view that, since there has been no controversy with respect to the defendant's operation of the Fort Dodge plant, no reason to anticipate any such controversy, and no dispute over the defendant's having met in full its obligations under the lease as construed by it, the question whether or not there may be an implied covenant in the lease with respect to the manner in which the plant is to be operated by the defendant is not before us for review and that no opinion with reference to that question should be expressed.