## Winco Block Coal Co. v. Evans et al.

(Decided Nov. 2, 1934.)

W. R. McCOY and EARLE CASSADY for appellant.

J. B. CLARK and W. H. D. PREECE for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

On November 1, 1920, A. E. Evans and his wife, Addie Evans, G. W. Stepp and his wife, Ellen Stepp, and G. C. Stepp executed a coal lease to O. H. Jennings and H. J. Brock, trustees, who sold and assigned the lease to Winco Block Coal Company, and that company entered under the lease and began mining the coal. Addie Evans afterwards died and on April 13, 1931, this action was brought by the Stepps and her devisees against the Winco Block Coal Company, alleging that the royalties under the lease had not been paid and that a balance of $4,981.00, was due and unpaid. The company filed answer. Voluminous proof was taken and upon final submission of the case on October 26, 1932, a judgment was rendered in favor of the plaintiff for $3,421.65, with interest from that date and costs; and a sale of the leased property was ordered to satisfy the judgment. The defendant appeals.

The lease was for a term of fifty years with the privilege of renewing it for a further period of fifty years. It contained among other things these provisions:

"6. Conditional Termination of Lease. This lease to terminate, notwithstanding the aforementioned terms, when all the workable and merchantable coal shall have been taken from the premises herein demised; when such time shall have arrived, in the opinion of the lessees, notice shall be given to the lessors and an opportunity given them to determine whether all the workable and merchantable coal has been removed from the premises, it being understood that workable and merchantable coal shall be only such coal as can be mined at reasonable and just expenditure.

"7. Land Rental as Minimum Royalty. The lessees shall pay to the lessors during the first year of this lease as minimum royalty the sum of $1,500.00 per year; for the second year of this lease as minimum royalty the sum of $3,000 per year; and all subsequent years thereafter the sum

of $3,000 per year as minimum royalty for said land, the same to be due and payable quarterly; and the same being provided as minimum royalty to be received by the lessors per year, whether or not the coal shall have been mined which at the royalty hereinafter fixed would amount to such rental or not.

"8. Royalty on Coal Mined. The lessees shall yield and pay to the lessors a royalty on each and every ton of coal mined under the terms of this lease the sum of fifteen cents per ton for each and every ton of 2,240 pounds of coal mined, manufactured and transported from or utilized upon said premises during the term thereof; said royalty shall be due and payable quarterly on the first days of January, April, July, October, respectively, in each year, and shall be paid within thirty days, and it is agreed that in event the royalty on coal mined under the provisions above, for any year, shall equal or exceed the yearly royalty as provided in paragraph 7, then the royalty shall be in lieu of rental or minimum royalty for such year. In the event the royalty on coal mined shall be less than the rental for any year of the term thereof, the amount of the royalty shall constitute and be taken as a credit on the minimum rental for such year and the balance of the rental for such year only shall be payable under the provisions of said paragraph 7; but the lessees however shall have the privilege at any time during the succeeding ten years from the date hereof of mining free from royalty a sufficient quantity of coal over and above the quantity required to yield the minimum annual rental for said years at the rate of tonnage royalty above provided for, to reimburse it for any deficiency that may have occurred in any of the preceding years.

"The lessees shall pay to the lessors one cent for every ton of 2,240 pounds of coal mined from other lands now owned or leased, or that may be acquired or leased, and transported over, through or under the above premises during the continuation of this lease, or any extension thereof.

"12. Strikes. In case of general strike or other unavoidable accident, such as destruction of tipples or explosion in mines, or total suspension.

of service by railroad company, inadequate car supply or other cause over which the lessees have no control, and for which they shall have been in no wise to blame, the rental hereinbefore fixed as a minimum royalty shall be suspended during the actual time the operations for any such cause may have been stopped.

"16. Payment of Royalties. It is further agreed that in the event the lessees shall find it impossible, by due diligence, to carry out the terms of this lease profitably to themselves, then it is agreed that the said lessees may, upon the terms herein set forth, surrender this lease; but the lessees shall not have the right to surrender this lease to avoid the terms thereof until they shall give to the lessors sixty days notice in writing of their intention so to do, and shall in the meanwhile fully comply with all and singular the terms and stipulations of this lease."

The company went to work promptly under the lease and there was no trouble between the parties until about the year 1928. The company owned a number of other tracts back of the three tracts here jointly leased, some of which it used to bring out the coal from the other tracts.

The lessors, G. W. Stepp, G. C. Stepp, and Addie Evans at the time of executing the lease here involved each owned small adjoining tracts of coal land, which they in 1920 jointly leased to O. H. Jennings and H. J. Brock, who in turn assigned it to appellant. As stated, by the terms of article 6 of the lease, it is provided that the lease should terminate "when all the workable and merchantable coal shall have been taken from the premises herein demised, * * * it being understood that workable and merchantable coal shall be only such coal as can be mined at reasonable and just expenditure."

After the lease was assigned to the appellant, it appears that, as stated, it immediately proceeded to open up the lower or Chilton seam of coal in this tract, which was at first over three feet thick and clear of much impurity and which it worked or mined until it was found that the coal in that seam was no longer either "workable or merchantable" and that it could not be mined at a "reasonable expenditure," due to the diminished size of the vein, nor, due also to its defective

and unmarketable quality, could it be sold at a profit. Upon the exhaustion of the marketable and workable coal in this lower seam, it at once abandoned it and proceeded to open and mine an upper coal seam upon the leased tract. Upon mining into this coal seam, it too soon became broken by seams of slate and other impurities, which rendered it of such low grade as to be practically unmarketable and worth only about 20 per cent. of what it appeared worth at the opening of the seam. Upon this condition being found and realizing that it had practically exhausted both of the tracts' coal seams of their "merchantable and workable coal," the company, as provided for by section 6 of the lease, treated the lease as terminated and closed the mine upon which it had spent in its development something over $200,000. Upon closing down coal mining on the Evans tract, the company did not continue to further occupy or use it in any way, since it appears that, although it was one of the three tracts jointly leased it, it was never used or selected by the appellant for the location of any of the company's miners' houses, tracks, etc., nor did it even occupy it except when it entered and mined about one-half acre of the coal therefrom before finding that it was "unmerchantable and unworkable," when it immediately abandoned the Evans tract. The company's houses, tracks, etc., it appears, are located on the properties of G. W. and G. C. Stepp, owners of the other two small tracts embraced in the joint lease before us and who, it appears, have given up this original joint lease and entered into a new lease contract of their tracts with the appellant, effective since 1930.

The court is of the opinion that it is sufficiently shown by the record that the coal seams mined under this lease on appellee's tract failed to the extent of 80 per cent. of the quantity and quality of coal shown by and to be expected from the outcropping of the seams, and that the uncontradicted evidence shows the coal seams, upon being mined into, produced neither workable nor merchantable coal as provided for in the lease, the lease also providing that in such event it should be terminated. The words "workable and merchantable coal," used in article 6 of the lease, are defined by the same section as being "only such coal as can be mined at reasonable and just expenditure."

It is shown by the evidence introduced by appellant

that long before the decline or slump in the coal market and generally depressed business conditions in the country, the coal mined from appellee's tract soon became "so inherently defective" in quality as to be generally unmarketable and that, after the seams were gone into, their coal could not be mined at a reasonable or just expenditure on account of the seams of coal being broken by seams of slate and other impurities of which the coal could never be cleaned or sold on the market at a profit. Engineers, as well as many of their former coal dealers, through whom appellant tried to market the coal mined from this tract, gave undisputed proof as to the quantity and quality of coal mined from these seams, toward the end of their mining, becoming such that it could not be either mined at a reasonable expenditure or, when mined, marketed because of its inherent defects. Another coal dealer witness testified that the coal was entirely unmarketable; that they had sold the coal until 1928, during which time they had considerable difficulty in disposing of it, and they could not get any resale orders on it, while in some places the people insisted on the coal being taken out of their cellars or out of their yards; and that, due to such instances, their coal sale agencies cancelled their contracts and refused to sell the coal.

There is extensive evidence of this character in the record, which is uncontradicted and must therefore be accepted as true. These troubles in selling this coal by appellant, so testified to, were experienced before the closing down of the mine on appellee's tract and were in fact the reason for its closing down. The company's difficulty in operating these coal seams under the lease did not arise through falling market conditions, which were then good, but arose through the exhaustion of the plaintiff's merchantable and workable coal upon the leased tract. We are of the opinion that these named conditions, showing the practical exhaustion of the workable and marketable coal upon appellee's tract, entitled appellant, as provided by article 6, to terminate the lease, and that therewith the payment of minimum royalties discontinued. Further, we do not regard the appellant's inability to sell the mined coal at a profit as being due to a bad market, or as giving it the right upon such ground to terminate the lease under its section 12, providing for the suspension of the payment of royalties in case of general strike or other

unavoidable accident, etc., but rather we conclude its justification for terminating the lease is bottomed upon its demonstrated inability to sell the mines' only low grade coal at a profit, and that such was an occuring of the contingency named under the express provisions of section 6 of the lease, providing that the lease should terminate when all the workable and merchantable coal should have been taken from the premises and defining the words "workable and merchantable coal" as meaning "only such coal as can be mined at reasonable and just expenditure," or of a grade capable of being sold upon the market at a profit. Restatement of the Law. of Contracts, section 460 (2), page 859.

In the case of Elkhorn Star Coal Co. v. Hall, 222 Ky. 348, 300 S. W. 864, 865, where a like clause of a coal lease was before the court as found in article 12 of the present lease, but wherein the bad condition of the coal market was there relied on to excuse it from payment of royalties, the court said:

"But this clause refers to delay in getting the coal out or getting it to market; it does not refer to troubles in selling the coal. The words 'causes beyond control' refer to mining or shipping troubles. The coal market is always beyond the control of the miner. He took the risk of the coal market in making his contract."

To like effect, see Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S. W. (2d) 517, 522, where the court, again speaking to like effect, said:

"We are therefore clearly of the opinion that in the lease contract here under discussion there was, so long as the seam of coal exists in quantity and quality as known and to be expected at the date of the lease, no condition implied in law which would relieve the lessee from the payment of royalties because the mining of that seam could no longer be conducted at a profit due to falling prices * * *"

We fully approve of the holding and conclusion of the court as announced in these quoted cases as based upon the facts and grounds there stated, but we do not feel that they cover or properly apply to the different situation or facts presented in the present case, where appellant's trouble, causing his nonpayment of royalty,

was not bottomed on its loss of profits suffered by selling its coal upon falling markets, over which it had no control in its disposition, as discussed in the cited cases, but rather was it due to (under the evidence) and caused by the failing quantity and quality of the coal, rendering its mining cost unreasonably high and its vendibility low and slow. The minimum royalties were discontinued and the lease canceled after it appeared that the company had mined all of the merchantable and workable coal called for in the lease, that it was practically exhausted, and that no other seams of such grade of marketable coal longer existed upon appellee's tract as known and to be expected at the date of making the lease.

A reading of the lease as a whole discloses that the intent and purpose of the instrument, though a lease made for a term of fifty years, was that it should terminate upon its appearing that the minable coal had become exhausted, and to such effect was it held in Auxier Coal Co. v. Big Sandy & M. C. Coal Co., 194 Ky. 14, 238 S. W. 189, 191, wherein the court said:

> "It was agreed in the lease of June 15, 1911, that the lessee should have the exclusive right and privilege of mining all seams of coal in or under the leased premises, and, further, that the lease was made for the sole and 'only purpose of mining and shipping coal and manufacturing and conducting a general merchandise business in connection therewith.' While the term was for 25 years and the lessee agreed to pay stipulated minimum royalties during the term, the intent and purpose of the lease must be read into its provisions, and it having become impossible through no fault of appellees to effectuate that purpose, it necessarily results that the lease is terminated. 6 R. C. L. p. 1005. Hence appellants' claims to minimum royalties, arising after the minerals were exhausted, are impossible of sustention."

Also, in Byrd v. Anderson, 207 Ky. 317, 269 S. W. 323, 325, in considering a like question the court said:

> "The exhaustion of the minable coal in the land must, in our view of the law, be held to have the effect of terminating the contract."

The contract or lease here before us in which appellant was to continue to pay throughout the long term

fixed minimum royalties upon the coal to be mined could only be reasonably interpreted as based or predicated upon the continued existence of the coal, and, this failing, it must needs follow that the contract by reason of such failure terminates.

This rule is thus stated in section 369, p. 1005 of 6 R. C. L.:

"The authorities establish the principle that where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled, unless when the time for the fulfillment of the contract arrived, some particular specified thing continued to exist, so that, when entering into the contract they must have contemplated such continued existence as the foundation of what was to be done, the contract is not, in the absence of any express or implied warranty that the thing shall exist, to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing, without default of the contractor."

However, in the instant case it is not necessary to rely upon such implied condition, as the language of the present lease expressly stipulates that upon the failure or exhaustion of the defined class of coal, the lease should terminate. Also, we are of the opinion that the above-stated rule extends even further than being applicable to a case of complete exhaustion of coal but would apply, as coming within the reason for the rule, to a case where, as here, the coal has become, upon mining, so deficient both in its quantity and its vendible quality as to make it unmarketable at a profit and has thus proven not to be such either as to quality or quantity as the company had a right to expect it was contracting for from the indications afforded by the outcroppings inspected when making their lease contract. In such case, too, under the quoted rule the contract should terminate and the lessee be relieved of the payment of the minimum royalties promised by it upon the assumption that it would find in its mining of the leased property a continuance of the indicated supply and quality of coal.

We are of the opinion that the rule as stated in the Auxier Coal Case, supra, is applicable to and controlling of the situation here before us. The same rule was

496

further stated in the case of The O. K. Jellico Coal Co. v. L. L. Parks & L. M. Parks, 146 Ky. 674, 143 S. W. 22, 24, by this court in language perhaps even more applicable to the facts in the instant case. It said:

"The chancellor failed to state the ground upon which he rested his judgment. But he evidently proceeded upon the idea that, because the company failed to continue to operate the mine after it had been demonstrated that it could not be made a success, appellees had been damaged, to the extent of his finding, by their loss of royalties. He lost sight of the fact that the company was not bound to operate the mine if the output could not be sold, from time to time, as other coal; and that when it was thoroughly demonstrated that this could not be done the company was absolved from further liability to work it."

We therefore conclude and are satisfied, for the reasons stated, based upon a careful consideration of the lease contract and a like consideration of the pleadings, and proof, that appellee is not entitled to recover thereon, because of its having been terminated by exhaustion of its marketable coal, and the petition should therefore have been dismissed.

Judgment reversed.