## MARTINS FORK COAL CO. v. HARLAN-WALLINS COAL CORPORATION.

### No. 6939.

Circuit Court of Appeals, Sixth Circuit.

May 6, 1936.

H. C. Gillis, of Williamsburg, Ky. (Tye, Siler, Gillis & Siler, of Williamsburg, Ky., and H. H. Fuson, and J. B. Snyder, both of Harlan, Ky., on the brief), for appellant.

Cleon K. Calvert, of Pineville, Ky. (F. A. Berry, of Nashville, Tenn., on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

A bill in equity was filed by the appellant to restrain waste and for damages for injury and destruction to property in the operation of a coal mine on appellant's property by the appellee under lease. The case was tried by the late Judge Cochran, who in an exhaustive opinion analyzed the

evidence and applied .thereto the legal principles which persuaded him that the appellant had failed to make a case for damages on account of waste or for substantial damages on account of injury or destruction to property. Formal findings of fact and conclusions of law substantially in consonance with Judge Cochran's opinion were made by Judge Dawson, who also entered the decree appealed from.

The appellant was the owner of a substantial tract of coal land in Harlan county, Ky., part of which was originally leased to the Catrons Creek Coal Company for a coal mining operation in 1913 and part of which was leased to the same operator in 1917. The two leases were assigned by the Catrons Company after a period of operation to the Wallins Creek Coal Company, and later by various assignments passed to the appellee, who assumed them as of the 1st of September, 1924, agreeing to pay the reserved rents or royalties to become due after that date and to keep and perform all the required covenants, agreements, and conditions therein contained.

Prior to the last assignment the property had been operated not only by the Catrons Creek Coal·Company but by the Wallins Creek Coal Company and the Wallins Creek Collieries Company. From then on, and until suit below was begun, it was operated by the appellee. Three seams of coal ran through the property, the Harlan, the Kellioka, and the Mason. The leases bound the named lessee and its assigns to mine all "workable and merchantable" coal on the premises. The action as originally brought was planted upon the theory that the present assignee was responsible for all waste and damage done to the property during the life of the leases, whether committed by it or its assignors; that all three seams contained workable and merchantable coal, and the bill prayed heavy damages, enlarged by successive amendments to a claim of over $420,000, including exemplary damages for wanton waste. Confronted with proofs that the Kellioka and Mason seams contained no workable and merchantable coal, and with the decision of the District Judge that the appellee was not responsible for waste committed by its predecessors, the appellant has now abandoned the two stated contentions, and bases its claim wholly upon waste and other injury to its property committed solely by the appellee.

The mines upon the leased premises were "drift" mines. Some understanding of their construction and method of operation is necessary to properly appraise the evidence at the trial. The approved method of working a mine of this character is to first drive a horizontal tunnel or "entry" into the mountain at the level of the coal vein. Parallel with the entry, and usually 50 or 60 feet from it, an airway is driven. At regular intervals along the entry cross-entries are turned off, and at intervals of approximately 60 feet "break-throughs" are cut to connect with the airway. On each side of the cross-entries and at right angles thereto, "rooms" or excavations in the coal are made. The rooms are driven into the mountain to such depth as can conveniently be worked or until they approach each other, which is usually 150 feet or more and of the height of the coal seam. The work of driving the entries, cross-entries, and airways, and the removal of the coal from the rooms, is called "advance work," and during its progress large blocks or pillars of coal are left to support the roof. These are usually 50 or 60 feet wide, and are called "entry stumps" or "chain pillars." During the advance work probably little more than 50 per cent. of recoverable coal is removed; the remainder being left as support. The advance work is completed when the entry has been extended into the mountain as far as it may go. Then the "robbing work" or the "retreat work" is.begun. The proper method of robbing is to begin at the end of the entry farthest from the mouth of the mine and "pull" the pillars and other supporting coal. This is done by digging or blasting, and progresses continuously toward the mouth of the entry, so that when completed substantially all recoverable coal has been mined.

It is conceded that the cost of mining and removing coal in retreat is normally much less than in advance, but, if the advance work has not been properly done, it may be difficult and expensive to recover the coal on retreat. Where mining is unscientifically done, the miners will "hog out" the coal where they can get at it in the easiest way. This is taking out too much coal from the supporting pillars so that the roof of the mine falls or becomes dangerous, causing loss of large areas of recoverable coal. Where insufficient support is left, it often occurs that falls of slate and rock from the roof of a room partially or wholly fill it. When advance

work has been improperly done, the mine is said to be "hogged out" or "butchered up," by which it is meant that it has become too dangerous or expensive to recover much of the coal which should be obtained in retreat.

The leases provided for minimum rental and a royalty of ten cents per ton on all of the coal mined and removed from the premises. The principal item of damage is based upon an estimate of 1,200,000 tons of coal lost by improper and unscientific methods of mining. There was voluminous testimony pro and con upon this issue. While much of it adduced on behalf of the plaintiff tended to show improper mining methods on advance, and loss of substantial quantities of coal on retreat, the difficulty that confronted Judge Cochran lay in the fact that the case was prepared solely upon the theory that the defendant was liable for all waste committed from the beginning of operations under the leases, and that it was impossible to determine what waste, if any, was committed by the defendant. This difficulty likewise confronts us. Judge Dawson found no evidence in the case that coal was lost by improper mining practices of the defendant after it took over the leases from the Wallins Creek Collieries Company. While a careful examination of the record leads us to doubt accuracy of this finding in its strict literalness, and while Judge Cochran made no finding but merely assumed that there was such evidence, we think the latter's opinion sound in the conclusion that it is impossible to determine what waste was committed by the defendant as distinct from that committed by its predecessors.

The appellant presents a great array of authorities in support of the principle that damages are not rendered uncertain merely because they cannot be calculated with absolute exactness. We accept them as controlling, but only when some reasonable basis of computation is afforded. Eastman Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. Shannon v. Shaffer Oil & Refining Co., 51 Fed.(2d) 878, 881, 78 A.L.R. 851 (C.C.A.10). As was said in the second of the cited cases; "Where there is proof, within the permissible range of certainty, that a right of a plaintiff has been invaded, he [the plaintiff] should not be denied a substantial recovery because of the difficulty in accurately measuring his dam-

ages," or, in the familiar formula, the defendant should not "benefit through his own wrong." The present record, however, presents a more difficult situation. While there is room for inference that wasteful methods continued in the defendant's operations, the proof is neither clear nor certain that they did so, and the inference is challenged by a great number of apparently reputable witnesses. There is ample support for the finding in that respect if we accept it as a factual conclusion based upon a preponderance of evidence and give to it the usual weight that attaches to the findings of the District Judge. There are other considerations which lead to the same conclusion. Assuming practices which under normal conditions might be regarded as improper, we are unable to say that they were not forced upon the defendant by the butchering up of the mine by its predecessors. There is evidence, not satisfactorily challenged, that prior workings resulted in the development of a "squeeze" or "creep" in the mine which made it extremely dangerous to remove otherwise recoverable coal. A squeeze is caused by removing adjacent support improperly and allowing an area of roof to drop vertically. A creep is caused by so improperly removing support as to allow the top to press diagonally across the coal in front, causing the mass to move or roll forward. These conditions are destructive of the coal on which the one falls or over which the other rides. There is also evidence that water was let into the mine by the Wallins Creek Coal Company, or the Wallins Creek Collieries Company, by improperly cutting a draught hole into an adjoining mine. The defendant produced ample evidence that, while other water in the mine was controllable, this water was not, although effort was put forth by the defendant by means of pumps, ditches, and siphons to get rid of it. The evidence to this effect is clear and not successfully challenged. It being conceded that the defendant is not chargeable with improper practices prior to beginning its own operations, we think it was under no obligation to remove coal which, though recoverable in the beginning, had become unworkable through no breach of covenant on its part.

We accept the plaintiff's statement that the most profitable phase of coal mining operations is the recovery of coal upon retreat. This being so, no logical reason

appears for the sacrifice by the defendant of the most profitable part of its undertaking. It is suggested that the defendant was anxious to abandon the lease so as to transfer operations to other mines which it controlled. The reason is neither persuasive nor in the light of the evidence more than a surmise. It is somewhat difficult to understand, in view of the clear showing of improper practices in the advance work most clearly attributable to the original lessee and intermediate assignees long before the defendant came upon the scene, why no relief was sought by the appellant prior to the present suit. While no question of laches is raised, yet the unexplained delay suggests such failure of earlier inquiry as to warrant the inference that no more definitive allocation of fault as between defendant and its predecessors could have been established had the plaintiff from the beginning recognized the presently accepted limitation on the measure of damages. Since, therefore, we are unable upon this record to enter a decree granting recovery for waste, and no showing is made that other proof could have been presented, or is now available, the decree below will not in this respect be disturbed.

█ It is conceded that 19,250 tons of recoverable coal were abandoned by the defendant when it left the mine. But the defendant was enjoined by a restraining order of the state court in which suit was originally brought from removing the supports from the mouth of the entries and from permitting the entries to fall in and close up. The only entries which the defendant was then operating were the main entry and one to the left of it. The coal supports could not have been removed without risk of contempt. We agree with the decision below denying recovery for this item of damage. Royalty was claimed for coal removed from the premises and not shipped to purchasers. In support there was produced the testimony of a single witness testifying from memory after considerable lapse of time. This was controverted by the record books of the defendant. The court accepted the latter. Since nothing was suggested to impeach their accuracy, and they had long been accepted by the plaintiff without demur, we cannot say that this was error. Nor are we warranted in disturbing the lower court's findings or conclusions in respect to damages to improvements erected upon

the property by the defendant. The lease permitted such improvements, and, while they became part of the realty, there was no covenant to keep them in repair—at least not beyond the period of operation—and what was agreed to be surrendered was the leased property, of which the improvements were not at the execution of the lease a part. So far as any improvements were removed, the court allowed such minor damages as were sustained by the evidence. Its findings in this respect are likewise not to be disturbed.

The decree below is affirmed.