No. 40,566

EDWARD GEIER and ETHEL GEIER, *Appellees*, v. THE EAGLE-CHEROKEE COAL MINING COMPANY, a Corporation, *Appellant*.

(313 P. 2d 731)

Opinion filed July 3, 1957.

*H. Gordon Angwin,* of Pittsburg, argued the cause, and *Ben W. Weir,* of Pittsburg, was with him on the briefs for appellant.

*D. G. Smith,* of Girard, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from an order sustaining a motion for judgment on the pleadings in an action for the recovery

of money under the terms of a strip coal mining lease on land in Crawford county.

The pertinent portions of the lease material to the issues before this court read as follows:

"EXHIBIT 'A'

"LEASE

"THIS LEASE, made and entered into this 22nd day of October, 1951, by and between Edward Geier and Ethel Geier, his wife, of Crawford County, Kansas, parties of the first part and hereinafter referred to as lessors, and The Eagle-Cherokee Coal Mining Company, a corporation organized and existing under the laws of the State of Kansas, party of the second part and hereinafter referred to as lessee.

"1. LAND LEASED.

"That for and in consideration of the mutual covenants and agreements herein contained, and in the further consideration of the sum of One and no/100 ($1.00) Dollar, the receipt of which is hereby acknowledged, the lessor hereby grants and leases unto the lessee, its successors and assigns, for strip coal mining purposes, all of the workable, minable, strippable and merchantable coal *that can be practicably and profitably mined and removed by strip mining methods* with the mining equipment it now possesses or may acquire prior to the expiration of this Lease, upon and underlying the following described real estate, situated in Crawford County, Kansas, to-wit:

"The East One-half (E½) of the Southwest Quarter (SW¼) of Section Thirty-four (34), Township Twenty-nine (29), Range Twenty-four (24).

2. TERM OF LEASE.

"It is understood and agreed by and between the parties hereto that subject to all the terms and provisions hereof, the term of this Lease shall be *for a period of five (5) years* from the date hereof *or* until all the workable, minable, strippable and merchantable coal underlying the hereinabove described real estate, *which can be practicably and profitably mined and removed by lessee by strip mining methods,* shall have been mined and removed, whether the aforesaid coal be so stripped or removed before or after five (5) years from the date hereof.

"3. ROYALTY.

"It is understood and agreed that lessee shall pay lessors, as the entire rent and royalty due under the terms of this Lease, a sum equal to Twenty (20) cents per ton of 2,000 pounds runs of mine for all of the strippable and merchantable coal underlying the above described real estate and actually stripped, mined and removed by the lessee, . . .

"It is further agreed between the parties hereto that the *lessee guarantees to the lessors, as royalty payments, the total sum of Sixteen Thousand and no/100 ($16,000.00) Dollars; provided, however that the lessee may, at its discretion, terminate this Lease at any time, by paying Two Hundred and no/100 ($200.00) Dollars per acre for the remaining land.* Railway weights shall be taken as the basis of payment for royalty when coal is loaded and weighed on railroad cars, and when not so loaded and weighed, then fair

and accurate scale weights shall be taken as the basis for payment of royalty; *provided, that the lessee shall not be required to mine, remove or pay royalty on any dead or merchantable coal unless the said coal is sold by* the said lessee.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"8.  COAL TO BE REMOVED.

"It is further understood and agreed that subject to all the terms and provisions of this Lease, *the lessee,* in any event, *shall only strip and remove such strippable merchantable coal* underlying the hereinbefore described real property *as can be stripped and removed by lessee* with the equipment placed upon the hereinbefore described real property by lessee *at a fair and reasonable profit to lessee."* (Emphasis added.)

The appellees, Edward Geier and Ethel Geier, lessors herein, will be referred to in this opinion as plaintiffs as they appeared below, and the appellant, The Eagle-Cherokee Coal Mining Company, a corporation, lessee herein, will be referred to as defendant.

The plaintiffs filed an amended petition in the lower court wherein they sought a money judgment in the sum of $5,400.00 as liquidated damages on the ground that the defendant had exercised its discretion to terminate the aforesaid lease on April 1, 1953, with approximately twenty-seven acres of land remaining to be mined, under the provision of the lease calling for the payment of $200.00 per acre for the remaining land not taken and mined on the date of termination. The plaintiffs further sought interest at 6% from April 1, 1953.

Plaintiffs contend that the defendant by its answer admitted every essential fact contained in the amended petition, and since no issue of fact remained, their motion for judgment on the pleadings was proper.

The defendant by its answer admitted the lease, incorporated in the plaintiffs' amended petition, and alleged that the $16,000.00 guaranteed royalty had been paid in full and that, in fact, a total sum of $19,819.92 had been paid as royalty. The defendant alleged that the lease was for a five-year period and that it had not terminated the lease by its act or deed under the provision calling for the payment of $200.00 per acre for the unmined land, and denied that said provision was intended to be in addition to the $16,000.00 minimum royalty guarantee. The defendant alleged that further coal could not be mined at a fair and reasonable profit, and that for the fifteen months it conducted operations on the lease, said operations resulted in a loss. Defendant stated that the remaining coal was of the same kind and character and could not be mined at

a profit, by reason of the inferior quality of the coal, the thinness of the vein, the market conditions, the increased labor and other costs and the depth and character of the overburden overlying said coal. The defendant further alleged that it had fully performed its obligations under the terms and provisions of the lease, and that said lease should be by the court terminated and cancelled and the defendant released and discharged from any further performance, liability or obligations thereunder.

For affirmative relief the defendant alleged that approximately twenty-seven acres of unmined land was undisturbed and had its full agricultural and farming utility and was of the value of $100.00 per acre, for which defendant was entitled to a setoff or credit against the damages, if any, accruing to the plaintiffs, in the sum of $2,700.00.

The trial court entered judgment for the plaintiffs on the pleadings in the sum of $5,400.00 with interest at 6% from the 6th day of September, 1956.

The defendant appealed from the foregoing judgment and from all other adverse rulings. All of the rulings adverse to the defendant were specified as error and unless otherwise herein mentioned, resolve into a construction of the mining lease in question. The plaintiffs cross-appealed and specified as error the refusal of the trial court to allow interest at 6% from April 1, 1953, instead of September 6, 1956, as entered by the judgment.

The defendant's position is that the lease imposes upon it the duty to mine only the coal that can be practicably and profitably strip mined and further imposes an obligation to pay the plaintiffs not less than $16,000.00 as royalty, regardless of the number of tons of coal mined. Further, the defendant contends that under the lease it could cease to mine, if the mining operation was not profitable, by the terms of paragraphs No. 2 and 8 of the lease.

The plaintiffs predicate their action for damages on the theory that the lease guarantees to them that all of the land will be mined and if it is not all mined, then they are entitled to $16,000.00 minimum royalty and $200.00 per acre for any land unmined, irrespective of other provisions of the lease.

If the plaintiffs' position is correct in this case concerning the construction of the lease, there are no issues of fact remaining to be determined, and the motion for judgment on the pleadings was properly sustained. However, if the plaintiffs are incorrect and

the defendant's position is adopted, there then remain for determination in this case issues of fact which are raised by the pleadings. The principal issue in such event is whether or not the continued mining of coal after April 1, 1953, could have been practicably and profitably mined and removed by strip mining methods. We need not enumerate all of the other issues which the parties could litigate on the present state of the pleadings.

In hearing a motion for judgment on the pleadings which brings into focus the interpretation of a written contract, no evidence is admissible. (*Hutchinson Municipal Airport Cases,* 161 Kan. 502, 169 P. 2d 615.)

In *Buechner v. Trude,* 175 Kan. 572, 266 P. 2d 267, it was said:

". . . Ordinarily a motion for judgment on the pleadings invokes the judgment of the trial court on questions of law as applied to the pleaded and conceded facts. A judgment on the pleadings is rendered not because of lack of evidence or proof, but because of a lack of issue of fact. If there is no issue of material fact presented by the pleadings, then it becomes a question of law as to which party is entitled to judgment. But if a material issue of fact is presented and remains undetermined, a judgment on the pleadings is improper. . . ." (p. 574.)

Aside from an application of the foregoing rule, plaintiffs must mesh their case into another set of rules governing the construction of a written contract to circumvent the necessity of receiving evidence. These rules are well summarized in *Oliver v. Nugen,* 180 Kan. 823, 308 P. 2d 132, where the court said:

"The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights . . .

"It is a judicial function to interpret a written contract which is free from ambiguity and does not require oral testimony to determine its meaning. Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning . . . If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard but not for the purpose of varying and nullifying its clear and positive provisions . . ." (pp. 827, 828.)

While a court has jurisdiction to interpret and construe a written instrument it has no jurisdiction to reform the instrument by rejecting words of clear and definite meaning and substituting others

therefor. (*Sipes v. Pessemier*, 144 Kan. 300, 58 P. 2d 1085, and cases cited therein.)

Another rule of construction applicable to written contracts is found in *Haynes Hardware Co. v. Western Casualty & Surety Co.*, 156 Kan. 356, 133 P. 2d 574, where this court said:

". . . Where an irreconcilable conflict exists between general provisions of a contract and particular portions written into the contract preference is given to the latter for the purpose of ascertaining the intention of the parties. . . ." (p. 362.)

In placing a construction on a written instrument reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided. The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by a critical analysis of a single or isolated provision. (*Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, 240 P. 2d 465; *Brooks v. Mull*, 147 Kan. 740, 78 P. 2d 879; and *Heckard v. Park*, 164 Kan. 216, 188 P. 2d 926.) It is not the province of the court to make contracts for the parties. Its function is confined to an interpretation of the contract which the parties have entered into. Every presumption is in favor of the legality of a contract rather than its illegality. (*Mosher v. Kansas Coop. Wheat Mkt. Ass'n.*, 136 Kan. 269, 15 P. 2d 421.)

Giving the foregoing rules of construction full credence we turn now to the specific provisions of the lease heretofore quoted. It must first be noted that an application of the pertinent rules of construction to the face of this instrument does not result in a conclusion that the lease is ambiguous. In other words, its meaning after reasonable interpretation is not uncertain.

When all of the provisions in the lease itself are considered, it is readily apparent that the parties thereto knew of the coal strata underlying the surface of the land described in the lease with reasonable certainty and the overburden which had to be moved to conduct coal mining operations on the premises by the strip mining method. Each and every numbered paragraph of the lease herein set forth emphasizes the economic factor of *profitable* mining operations on the part of the lessee.

By the provisions of paragraph No. 1 the lessors lease to the lessee for strip coal mining purposes *all the merchantable coal that can be practicably and profitably mined and removed* by strip

mining methods upon and underlying the described eighty acres of real estate. It is observed from a literal interpretation of the wording that the land itself was not leased, although in mining the coal that could be profitably produced that was the practical effect of the lease.

The term of the lease under paragraph No. 2 was designated as five years *or until all the merchantable coal, which can be practicably and profitably mined* and removed shall have been mined and removed.

The royalty provisions under paragraph No. 3 are conditioned on the fact that the lessee shall not be required to mine, remove or pay royalty on any *dead or merchantable coal unless said coal is sold* by the lessee.

The coal to be removed under paragraph No. 8 obligates the lessee to remove only such *merchantable coal as can be stripped and removed by lessee at a fair and reasonable profit to the lessee.*

These are all specific provisions in the lease and not general provisions designed under rules of construction to take a subordinate position to other specific provisions in paragraph No. 3. The fair import of these provisions in economic terms is that the lessee is obligated under the lease to mine only such coal as results in a profit to the lessee in terms of dollars and cents. This means that the gross income must exceed the gross expenses from such mining operations. The lease even goes further and ties the economic profit factor to the actual *sale* by the lessee of the merchantable coal mined or removed by excusing lessee from the payment of royalty if the coal is not sold.

The economic profit factor was so motivating and dominant in the minds of the parties to this lease that the natural term of the lease itself was tied to it. While the term of the lease is stated to be for a period of five years from October 22, 1951, it is followed by an alternative provision of equal significance reading: " . . . *or until all the* . . . *merchantable coal* . . . *which can be practicably and profitably mined and removed* by lessee by strip mining methods, *shall have been mined and removed, whether the aforesaid coal be so stripped or removed before or after five (5) years from the date hereof."* (Emphasis added.) In plain language this means that the lease terminates when coal can no longer be profitably mined from the described land regardless of how long the period of time may be.

Another method for terminating the lease is provided. As a part of an isolated second paragraph in the provisions concerning royalty under paragraph No. 3 is the following: ". . . the lessee guarantees to the lessors, as royalty payments, the total sum of Sixteen Thousand and no/100 ($16,000.00) Dollars; provided, however that the *lessee may, at its discretion,* terminate this Lease at any time by paying Two Hundred and no/100 ($200.00) Dollars per acre for the remaining land . . ." (Emphasis added.) These are specific provisions of the lease and are capable of construction consistent with the other specific provisions of the lease heretofore discussed. First, the clause after the word "provided" supplies an alternative method, at the lessee's discretion, to terminate the lease. The other method fixed the term of the lease by making it dependent upon the profitable mining of coal. When profitable mining ceased the lease terminated by reason of the expiration of the term of the lease. Therefore, the alternative method of termination in the discretion of the lessee consistently construed with the normal expiration of the term of the lease presupposes that the mining operations were profitable when the lessee exercised its option to terminate the lease by ceasing operations, thereby invoking the provision which required that lessee pay $200.00 per acre for the remaining acreage not mined.

The defendant (lessee) argues that this is an option of the defendant and one that only it can exercise, and is not a liquidated damage provision upon which the plaintiffs can predicate a cause of action. In support of its argument the defendant cites cases holding that an option to terminate a contract is in the nature of a forfeiture and will be strictly construed. (*Stromquist v. Nelson,* 159 Kan. 716, 158 P. 2d 458; and *Mosher v. Kansas Coop. Wheat Mkt. Ass'n.,* 136 Kan. 269, 15 P. 2d 421.) Defendant argues that since it has not paid the $200.00 per acre for the remaining acres it has not strictly complied with the conditions for terminating the lease under this option. We fail to see merit in this argument. If it were valid the defendant could with impunity defeat its obligation to mine so long as mining operations were profitable and thereby terminate the lease in a manner which is not provided in the lease. Here the parties have specifically provided how the lease may be terminated and we cannot alter the contract for them.

The plaintiffs' position on this point is that the $200.00 per acre provision is a liquidated damage provision which furnishes them

a cause of action at any time the defendant ceases mining, if at the time of such cessation of mining, all of the plaintiffs' land has not been mined. This position is untenable since it completely ignores the other specific provisions of the lease heretofore discussed.

A second significant relationship of the lessee's option to terminate is reflected in the lease. This lease covers eighty acres of land and guarantees a minimum royalty payment of $16,000.00 from mining operations. At the time the parties executed this lease the minimum guarantee represented $200.00 per acre to the plaintiffs, lessors.

Royalty, as used in this lease, refers to a payment reserved by the grantor which is payable in direct proportion to the number of tons of coal mined and sold. The royalty is fixed at twenty cents per ton. Technically, if mining operations ceased, no royalty would be payable in the strict sense that the term royalty is used. The minimum royalty guarantee of $16,000.00 was therefore tied to the option to terminate. If the lessee ceased mining operations prior to the payment of the minimum royalty guarantee of $16,-000.00, which the lessee had the right to do at its discretion, the payment of $200.00 per acre for the remaining land not mined became payable to the plaintiffs. In effect then, the option to terminate in the lease has a dual purpose in that it could be invoked prior to the payment of the minimum royalty guarantee, regardless of the profitableness of mining operations, or, after the minimum royalty has been paid, the lessee could hasten the termination of the lease, where mining operations were profitable, by invoking the provisions of the option. In each case the exercise of the option imposes on the lessee the obligation to pay $200.00 per acre for the land not mined.

In 17 C. J. S., Contracts, § 400, p. 891, it is said:

"The conditions imposed by the contract as precedent to the exercise of the right to terminate, including the method by which termination is to be effected, must be complied with, and the grounds for termination must have accrued . . ."

The answer of the defendant specifically sets forth that further mining operations were unprofitable by reason of its past experience with the mine. This raises a material issue of fact which remains undetermined, in view of the provisions of the lease as heretofore construed.

In the event that this fact is determined in favor of the defendant the lease would necessarily terminate by the specific provisions of

paragraph No. 2, provided the minimum royalty guarantee called for by the lease has been paid.

The defendant by its answer alleged that the $16,000.00 guaranteed royalty had been paid in full and that, in fact, a total sum of $19,819.92 had been paid as royalty. Under the circumstances here presented, the plaintiffs' motion for judgment on the pleadings is equivalent to a demurrer in that it admits the truth of all well-pleaded facts in the pleadings of the opposing party. (*Pennington v. Kross,* 154 Kan. 667, 121 P. 2d 275, and *Fidelity Life Ass'n v. Hobbs,* 161 Kan. 163, 166 P. 2d 1001.) This court, therefore, in ruling the instant case, is bound by plaintiffs' admission that the minimum royalty guarantee called for by the lease has been paid.

Lest the foregoing statements made in construing the provisions of the lease be misconstrued, it must be emphasized that we do not here or now decide whether the defendant would be excused from paying the minimum royalty guarantee where profitable mining operations could no longer be conducted on a lease such as this prior to the payment of the minimum royalty guarantee.

The construction placed on the lease under consideration in the instant case is consistent with authority in other jurisdictions. We have been cited to no Kansas decision which rules the precise point —whether the lessee under a coal mining lease is excused from further payment of any kind if the lease cannot be profitably mined.

On this point, 58 C. J. S., Mines and Minerals, § 189(b), p. 406, states:

"Under an express provision to that effect, in some mining leases the lessee is released from the further payment of rents and royalties in case the mineral becomes exhausted or is found not to exist in paying quantities. Even in the absence of such a provision, where the contract relates to mineral supposed but not known to exist, and the covenant of the lessee is for the diligent prosecution of the work and to produce the minimum quantity of the mineral if it exists, the lessee is released from payments if the mineral becomes exhausted, or is found not to exist in a paying quality or quantity, or the minimum amount cannot be mined without resorting to unreasonable expense or the employment of extraordinary means, although the lease provides that the lessee shall take out and pay royalties on a certain amount each year or that the royalties shall not be less than a fixed amount per year."

It has been held in other jurisdictions, that even without such written provision in a lease, if it appears on actual mining that coal or mineral ore does not exist in paying quantities or becomes exhausted, the lessee shall be excused from all obligations under the

lease, including the payment of minimum or guaranteed royalties. (*Winco Block Coal Co. v. Evans,* 256 Ky. 487, 76 S. W. 2d 241, and cases annotated in 163 A. L. R. 878, 880.)

Reference in the foregoing citations to release of the lessee from the payment of minimum royalty guarantee provisions in a lease should not be interpreted as a tacit approval by this court of such law as applied to the lease in the instant case. On this point two important reasons must be advanced to distinguish the lease in the case at bar from the leases in the cases cited. First, the minimum royalty guarantee in the instant case is an overall provision covering the full term of the lease, which is based on a value proportionate to the acres involved, and not just an annual minimum royalty guarantee as in the cases cited, and second, we are confronted with strip coal mining operations where the entire surface of land is completely destroyed by mining operations for any future agricultural use, while in the authorities cited this was not the situation. In a given case, when it appears before this court for decision, the facts may disclose that the farmer who executed the lease did so on the force that the minimum guarantee protected him on the value of his land which would be destroyed as an economic farming unit. This may be the basis upon which the parties contracted.

The plaintiffs by their cross-appeal specify that it was error for the trial court to refuse to allow interest at 6% from the 1st day of April, 1953, the date upon which defendant admits mining operations ceased, rather than September 6, 1956, when the judgment was entered.

G. S. 1949, 16-201, provides:

"Creditors shall be allowed to receive interest at the rate of six percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; . . . from the day of liquidating the same and ascertaining the balance; . . ."

In view of what has heretofore been said, it is apparent that the judgment entered by the lower court in sustaining the plaintiffs' motion for judgment on the pleadings was erroneous, and therefore, the damages to this date remain unliquidated. The plaintiffs would not be entitled under the statute to interest until the amount due them, if any, is ascertained. (*Govenius Bros. v. Reagor,* 130 Kan. 711, 288 Pac. 537; and *Latham v. Harrod,* 83 Kan. 323, 111 Pac. 432.)

Defendant specifies that the trial court erred in overruling its

motion to make separate findings of fact and conclusions of law. This motion was filed seven days after the final judgment was entered. G. S. 1949, 60-2921, provides:

"Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except generally, for the plaintiff or defendant, unless one of the parties request it, in which case the court shall state, in writing, the conclusions of fact found, separately from the conclusions of law."

This court has held on many occasions that a request to state separately findings of fact and conclusions of law is too late when made after the conclusion of the trial, and after a general finding has been announced. (*Wilcox v. Byington,* 36 Kan. 212, 12 Pac. 826; *Allen v. Dodson, Sheriff,* 39 Kan. 220, 17 Pac. 667; *Marquis v. Ireland,* 86 Kan. 416, 121 Pac. 486; and *Stecklein v. Stecklein,* 121 Kan. 490, 247 Pac. 449.)

In conclusion, it follows that the trial court correctly overruled defendant's demurrer to plaintiffs' amended petition as amended by interlineation, but erred in sustaining the plaintiffs' motion for judgment on the pleadings. The judgment of the lower court is reversed and the cause remanded with directions to the trial court to proceed and hear the cause upon the issues framed by the pleadings in accordance with the views expressed in this opinion.

It is so ordered.