383 S.E.2d 37

**KRYPTON COAL CORP., et al.**

v.

**GOLDEN OAK MINING CO., et al.**

No. 18425.

Supreme Court of Appeals of
West Virginia.

March 9, 1989.

Rehearing Denied July 20, 1989.

Ricklin Brown, Thomas A. Heywood, Bowles McDavid, Graff & Love, Charleston, for appellant.

Rudolph L. Di Trapano, Joshua I. Barrett, Ditrapano & Jackson, Charleston, for appellee.

NEELY, Justice:

Defendant Golden Oak Mining Co., Inc. is a wholly owned subsidiary of defendant Reading & Bates Coal Company. Golden Oak was conducting both surface and underground mining at its facilities in Letcher County, Kentucky, when in August, 1983, it decided to use auger equipment in conjunction with its surface mining operation to increase productivity. Accordingly, Golden Oak solicited bids for auger work from persons in Logan County, West Virgi-

nia known to Golden Oak. Another subsidiary of Reading & Bates had mined in West Virginia and there were officers common to this subsidiary, Golden Oak, and Reading & Bates.

Golden Oak was a non-union, Kentucky corporation; consequently, Golden Oak decided to contract with plaintiff Krypton Coal Corporation, also a non-union, Kentucky corporation, to do the auger work. Krypton, however, subcontracted with plaintiff D–G Auger Company of Logan County, West Virginia, to perform the actual augering, and that subcontract was approved in writing by Golden Oak. D–G auger leased equipment on a royalty basis from plaintiffs Ferrell and Robertson.

Golden Oak had a number of large properties under lease in Kentucky, and the contract between Golden Oak and Krypton provided that Krypton would auger mine the coal underlying an area known as the Crafts Colley site "from the Hazard # 4 and/or at Owner's sole option the Whitesburg" seams. D–G moved its equipment to the Crafts Colley site on 4 August 1983. The area to be mined under the contract was the Hazard # 4 seam of the Crafts Colley permit, with discretion in Golden Oak to allow Krypton (through its subcontractor D–G) also to mine a lower seam of coal, the Whitesburg seam. When D–G arrived at the site, Golden Oak had already been surface mining the area for several weeks.

Sometime before Thanksgiving, 1983, Golden Oak's surface operation encountered old mine works. Golden Oak's management concluded that the remainder of the coal that was projected to be in the Crafts Colley permitted area had already been mined out by deep mining methods many years before. D–G encountered the same old works the day before Thanksgiving. Golden Oak maintains, and offered evidence at trial, that the existence of these old, underground works prevented further operations either by Golden Oak's surface mine crew or D–G's auger crew.

After the initial discovery of the old mine works, Golden Oak searched for and obtained maps of this mined out area from an engineering firm in the Whitesburg area. From those maps it was determined by Golden Oak that the remainder of the Crafts Colley area had previously been mined, and that further operations would prove to be not only expensive but futile. The decision was then made to terminate Golden Oak's surface operations. As a necessary consequence of the cessation of the surface operations, D–G Auger had to cease augering because D.G.'s augering operation was dependent on continued surface mining to create an auger bench.

D–G had been experiencing unsatisfactory production at Crafts Colley, so at D–G's request Golden Oak allowed D–G to auger at another permit area known as "Bull Creek." The Bull Creek mining operations were conducted along a creek bed, moving upstream. After mining through approximately three quarters of the Bull Creek permitted area, the coal seam dipped below the level of the creek bed, leading Golden Oak's management to believe further mining to be impossible. This phenomenon was not unanticipated but occurred sooner than expected. The final pits that were dug in conjunction with the surface operation were constantly filling with water from the nearby creek bed, which ran at approximately the same level as the mining bench at that point.

On 19 April 1984 Golden Oak determined that because of the change in topography at Bull Creek all of the recoverable coal had been mined from that area. Therefore, Golden Oak discontinued the surface operation and, as a result, D–G again had to discontinue its augering operations. No additional mining was ever done at Bull Creek and that area has now been backfilled and reclaimed.

On 17 May 1984, D–G Auger made a written demand on Golden Oak for expenses in the amount of $44,331.51 to cover the cost of dismantling and moving the augering equipment onto and away from the Bull Creek site. Golden Oak responded that the contract did not provide for reimbursement for moving expenses and refused to pay D–G. Earlier D–G had made a request for reimbursement for coal that

was covered up and for equipment that was inadvertently damaged by the surface operations, which requests had been honored by Golden Oak.

Then, Krypton Coal, D–G Auger, Mr. Ferrell and Mr. Robertson sued Golden Oak and its parent, Reading & Bates Coal Company, in the Circuit Court of Logan County for lost profits arising, allegedly, from Golden Oak's arbitrary and capricious cessation of surface mining operations. The trial was held without a jury and the circuit court awarded $181,164 each to Mr. Ferrell and Mr. Robertson; $111,500 to Krypton Coal; and, $743,300 to D–G Auger. In addition, the circuit court awarded $10,000 in punitive damages against Reading & Bates Coal Company for conduct that was "in bad faith, willful and wanton, fraudulent and an intentional disregard of plaintiffs rights, . . ."

All of the work under the contract was to be performed in Kentucky and the contract at issue in this case has a clause providing that Kentucky law shall apply. Consequently, all parties agree that it is Kentucky law that must apply to this case. The appellants, Golden Oak and Reading Bates, assert numerous assignments of error; however, we find that the case must be reversed because of the clear language of the contract. We shall, therefore, confine ourselves to that issue.

## I.

Art. II, § 1 of the contract entered into between Krypton Coal and Golden Oak provides:

*"Duration:* Performance under this Agreement shall commence effective as of the 2nd day of August, 1983, and shall continue for two years thereafter until the 1st day of August, 1985 or until Contractor has mined the recoverable Coal from the Premises as determined in Owner's sole judgment, whichever occurs first; unless earlier terminated based upon a party's default hereunder as is hereinafter provided."

The contract between Krypton and D–G Auger was for a one-year term; Art. II, § 1 of that contract had a similar provision

allowing termination when, in Golden Oak's sole judgment, the recoverable coal had been mined from the premises. The circuit court, in his conclusion of law No. 4, found:

"Recoverable coal under Article 2, Section 1 of the contract refers to "merchantable and minable coal," mentioned earlier in the contract; this definition does not require that the defendant actually be able to mine and sell the coal at a profit but refers to that coal which can ordinarily be mined profitably by judicious mining practices, using modern methods and equipment and sound business judgment."

We find this conclusion of law erroneous in the context of this contract, which when read in its entirety, clearly contemplates auger operations as an adjunct to profitable strip mining.

█ The evidence in this case amply demonstrates that Golden Oak ceased its mining operations because it could not continue to surface mine coal profitably in the two areas where D–G was to auger. Although there is evidence in the record that in one part of the Crafts Colley tract Golden Oak was reluctant to pay wheelage to an adjacent landowner, the record supports the conclusion that in Golden Oak's judgment it was no longer profitable to continue operations. The term "merchantable and minable coal" denotes coal that can be recovered and sold at a profit. Under the contract Golden Oak did not have an obligation to continue mining at a loss merely to provide a bench for D–G's auger operation.

## II.

█ The contract between Golden Oak and Krypton, and the contract between Krypton and D–G Auger were entered into by sophisticated, commercial parties knowledgeable about the coal industry. Thus Art. II, § 1 of the contract between Golden Oak and Krypton, which provides that Krypton's right to auger will end when Krypton "has mined the recoverable coal from the premises as determined in owner's sole judgment," was intended to repose

in Golden Oak the determination of when mining activities became unprofitable.

Kentucky law clearly does not support the trial court's conclusion of law. Under Kentucky law the term "minable and merchantable coal" has been found to be that which "could be profitably mined by judicious methods," *Auxier Coal Co. v. Big Sandy Coal Co.*, 194 Ky. 14, 238 S.W. 189 (1922).[1] And this Court, in *Atwater v. Fall River Pocahontas Collieries Co.*, 119 W.Va. 549, 195 S.E. 99 (1937), rejected as "narrow and arbitrary" the proposition that minable coal is any coal that can be mined, regardless of cost, and specifically adopted the view of the Kentucky court in the *Auxier* case.

In *Martins Fork Coal Co. v. Harlan Wallins Coal Co.*, 14 F.Supp. 902 (E.D.Ky. 1934), *aff'd*, 83 F.2d 967 (6th Cir.1936), in discussing the term "merchantable coal," the Kentucky federal district court said that "it certainly includes the ideas of workability. It cannot be merchantable if it is not workable." The court in *Martins* said that "it would seem also to include the idea of being mined and sold at a profit" under ordinary or average conditions. And, in *Winco Block Coal Co. v. Evans*, 256 Ky. 487, 76 S.W.2d 241 (1934), the Kentucky Court of Appeals found that a clause of a lease which provided that the lease would terminate "when all the workable and merchantable coal shall have been taken from the premises herein demised … it being understood that workable and merchantable coal shall be only such coal as can be mined at reasonable and just expenditure," meant " 'only such coal as can be mined at a reasonable and just expenditure,' or of a grade capable of being sold upon the market at a profit. *Restatement of the Law of Contracts* § 460(2), p. 859." 76 S.W.2d at 244.

In *Kentucky and West Virginia Coal and Mining Co. v. Blue Diamond Coal Company*, 106 F.Supp. 274 (E.D.Ky.1952), the court held that a Kentucky coal corporation that suffered operating losses of $488,112.07 and encountered mining conditions that necessitated heavy added expenditures in order to mine the coal, was justified in terminating operations without liability under a lease provision that provided that the company would "remove all of the minable and merchantable coal herein leased."

Although the appellees presented substantial evidence that there was still coal at both the Crafts Colley and Bull Creek areas that could be recovered at a profit, it was not the judgment of the appellees' experts that the contract between Golden Oak and Krypton called for. Rather, it was the judgment of Golden Oak that governed contract rights, and there is no evidence in the record to indicate that Golden Oak did not *believe* that it could no longer operate profitably because of old mine works at Crafts Colley or the level of the stream at Bull Creek.[2]

---

1. Kentucky courts have somewhat limited the rule stated in *Auxier, supra,* in cases involving royalty payments under mineral leases. In *Lawrence Tierney Co. v. Kingston Pocahontas Co.*, 241 Ky. 101, 43 S.W.2d 517 (App.1931); and *Hall v. Eversole's Adm'r*, 251 Ky. 296, 64 S.W.2d 891 (App.1933), the court held that a lessee is not excused from performance or payment of royalties when mining becomes unprofitable due to falling market prices. It should be noted that these cases were decided during the depression and that changing market prices are not at issue in the case *sub judice.*

2. Appellees argue that the contract between the parties should be interpreted as requiring an objective standard for determining when the recoverable coal has been mined. Had the parties intended that an objective standard would apply, the contract would not call for the "sole judgment" of Golden Oak, but would state that the contract terminates when the recoverable coal has been mined. Although the law imposes a requirement of good faith in the exercise of Golden Oak's judgment, it does not require nor allow a court to rewrite the contract to require continued mining until all recoverable coal has, in fact, been mined. The proposition is well stated in *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Ass'n*, 97 Ill.App.3d 22, 52 Ill.Dec. 303, 421 N.E.2d 1375 (1981) (cited as authority by both parties):

> Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously. Where contractual discretion is exercised in bad faith, the contract is breached and it is incumbent on the courts to grant appropriate relief; however, bad faith is not synonymous with erroneous judgment.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Logan County is reversed and the case is remanded with directions to enter judgment for the defendants.

Reversed and remanded with directions.

There can be no relief from an erroneous judgment exercised in good faith pursuant to a valid discretionary power. [Citations omitted].

52 Ill.Dec. at 309, 421 N.E.2d at 1381.