**CARTER ELECTRIC COMPANY and General Insurance Company of America, Appellants,**

v.

**The TRAVELERS INDEMNITY COMPANY and Beacon Construction Company of Massachusetts, Inc., Appellees.**

**No. 9078.**

United States Court of Appeals
Tenth Circuit.

Aug. 9, 1967.

William J. Becker, Clayton, Mo. (James Yates, Kansas City, Kan., and Joseph J. Becker, Clayton, Mo., were with him on the brief), for appellants.

Robert J. Sherer, Boston, Mass. (Leonard O. Thomas, Kansas City, Kan., was with him on the brief), for appellees.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

LEWIS, Circuit Judge.

Appellant Carter Electrical Company was the electrical subcontractor and appellee Beacon Construction Company the prime contractor on the construction of a Capehart housing project for the United States Army at the Fort Leavenworth Military Reservation in Kansas. This diversity action was brought by Carter against the surety on Beacon's payment bond, The Travelers Indemnity Company, for an alleged unpaid balance due, plus interest, under the specific terms of the Beacon-Carter subcontract. Beacon intervened as a voluntary defendant, joined Carter's Surety, General Insurance Company of America, as third-party defendant and filed a counterclaim for damages caused by Carter's alleged performance delays and failure to correct or complete certain work as contemplated by the subcontract. Carter then attempted to amend its petition with a claim against Beacon for punitive damages for "tortious" breach of contract, but upon timely motion of defendants the claim was ordered stricken from the pleadings. The case was tried to the court without a jury. The parties stipulated that the payments due Carter under the subcontract amounted to $47,763.00 and to this the trial court added $1,035.00 for the reasonable value of additional labor and materials furnished by Carter in the performance of certain repair work outside the subcontract. On the counterclaim, the trial court found damages suffered by Beacon of $16,867.27 for Carter's delay of the construction project and $1,435.22 for costs of correcting and completing some of Carter's contract work. A net judgment was accordingly entered in favor of Carter and against Beacon and Travelers in the amount of $30,495.51 plus costs. Carter's claim for pre-judgment interest was denied.

In this appeal, Carter strenuously urges that the finding of the trial court with respect to the set-off of $16,867.27 for alleged delays was clearly erroneous. Carter also complains of the trial court's order striking the claim for punitive damages and its denial of pre-judgment interest on the net recovery. Neither of the appellees has cross-appealed. Carter's surety, General Insurance Company of America, was discharged as third-party defendant by the judgment of the trial court and for all practical purposes is no longer a party to this litigation.

Appellee Beacon Construction Company entered into a contract with Fort Leavenworth C-3 Housing, Inc., and the Department of the Army on August 13, 1959 for the construction of a 100-building, 200-unit armed services housing project at Fort Leavenworth, Kansas. On August 14, 1959, Beacon entered into a subcontract with appellant Carter Electric Company whereby, in consideration for a total price of $182,000.00, Carter was to furnish all labor and materials required for the complete electrical wiring of the project, including all equipment and fixtures to be used for electrical-distribution systems, street lighting, interior lighting,

and electric-utilities connections. The subcontract incorporated by reference the prime contract which required that all work be completed 365 calendar days after the date of closing. Payments to Carter were to be made monthly on the basis of Carter's work progress, less the usual ten percent retention until final payment to Beacon by the government.

Work on the project commenced immediately after execution of the contracts and proceeded in a routine manner until May 19, 1960 when a portion of the project was struck by a tornado. As a result of the tornado, all work was suspended until the amount of damage could be determined and work-progress schedules could be revised.[1] On June 25, 1960, at a meeting between representatives of Beacon and its various subcontractors, a revised completion date of November 1, 1960 was agreed upon with no indication from Carter's representative that there would be any difficulty in completing the electrical phase of the project by that date. Subsequently, the government granted Beacon an extension of 111 days to December 1, 1960 for completion of its performance on the prime contract, but the trial court found that this in no way operated to further extend the time for completion of Carter's subcontract.

The first serious problem relating to the progress of Carter's work arose in early September 1960. At that time some sixty percent of the buildings were ready to receive connecting lines or "service drops" from the distribution poles, but such work had not even been started. On September 12, 1960, Carter's president promised Beacon representatives

that installation of service drops would commence on September 19 and would be completed by September 30. Work on the service drops actually commenced on October 3 and was completed on October 31. On September 30, the date promised for completion of the service drops, ninety to ninety-five percent of the buildings had been made ready for service-drop connections. Without electricity in the buildings during the month of October, furnaces could not be operated, and the resulting lack of heat caused a series of delays in the work of other subcontractors whose operations required minimum building temperatures.[2] There were also problems with Carter's progress beginning in mid-November 1960. By November 11, kitchen cabinets had been installed in twenty-five percent of the buildings and were thus ready to receive fluorescent strip light fixtures. On November 16, Carter's president advised Beacon's job superintendent and general superintendent that all of the electrical work would be complete on December 7. On November 18, with forty-eight percent of the kitchen cabinets ready for light fixtures, Beacon officials learned that no such fixtures had even as yet been acquired by Carter. Carter in fact did not begin to install the fixtures until the first week of December and apparently did not complete these installations until the first week of January 1961. Most of the work performed during the final month of construction consisted of corrective or "punch list" work on deficiencies called to Beacon's attention by government inspectors. Many of the "punch list" items represented work

---

1. Apparently, the only effect the tornado had on the electrical work was the dislocation of nine distribution poles. Carter reinstalled the poles with Beacon's tacit approval. This was the subject of the trial court's award of $1,035.00 to Carter for labor and materials furnished outside the subcontract.

2. In addition to the delays in completing service drops, the trial court found from evidence submitted at the trial by Carter that in many instances intervals of

between three and four weeks elapsed from the time the furnace contractor completed his work to the time Carter wired the basements where the furnaces were located. Operations dependent upon minimum temperatures were installation of vinyl asbestos tile flooring, painting, and, to a limited extent, floor finishing. Delays in installation of tile flooring created consequent delays in installation of plumbing fixtures. Delays in painting created consequent delays in installation of door hardware.

which was or should have been performed by Carter.[3]

The project was turned over to and approved by the government on January 13, 1961 and Beacon closed its on-site facilities on January 20, some eighty days after the revised completion date of November 1, 1960. No payments had been made by Beacon to Carter for any work performed from October 1, 1960 to January 12, 1961. On January 13, representatives of Beacon and the government met in Albany, New York and, among other things, agreed to place in escrow in a Boston, Massachusetts bank for a period of one year without interest approximately $400,000 to guarantee payment of all monies owing to Beacon's various subcontractors, including $47,757 to Carter. On March 17, 1961, Beacon tendered to Carter a final settlement of its account which included the following notation:

> "You consistently failed to perform in accordance with the requirements of the subcontract. This has been the subject of considerable correspondence which you have in your files. Because of the delays, we have incurred additional costs amounting to approximately Eighty Five Thousand Dollars ($85,000.00). In an effort to make an amicable settlement, we have indicated settlement damages of only Thirty Thousand Dollars ($30,000.00)."

Carter refused to accept the settlement and in August 1961 initiated the present action to recover the full amount of monies due under its subcontract plus interest. Upon all of the evidence, the trial court found that Beacon had shown damages caused by the eighty-day delay of $67,469.10, that twenty days of the eighty-day delay were attributable to the derelictions of Carter, and that therefore one-fourth or $16,867.27 of Beacon's damages should be set off against the amount owing to Carter on the subcontract.

Appellant's initial contention is that the trial court erred in striking its claim for punitive damages. The claim was premised on the allegation that Beacon, with the knowledge and consent of its surety Travelers, had wrongfully, willfully and maliciously breached its contractual obligation to make final payment to Carter and other subcontractors by entering into the escrow arrangement with the government in order to receive final payments on the prime contract while preventing subcontractors from collecting monies contractually owing to them and thereby oppressing them into acceptance of unfavorable settlements or protracted litigation. We agree with the trial court that such an allegation, even when taken as true in its entirety, does not make out a case of tortious conduct on the part of Beacon. The rule in Kansas, as elsewhere, is that the motive of a defendant in breaching a contract is immaterial to the issue of damages. Mabery v. Western Casualty & Surety Co., 173 Kan. 586, 250 P.2d 824; 25 C. J.S. Damages § 120. Unless Beacon can be charged with having incidentally committed an independent tort such as a wrongful conversion, Watkins v. Layton, 182 Kan. 702, 324 P.2d 130, or fraud, Roseberry v. Scott, 120 Kan. 576, 244 P. 1063, mere allegations that the breach was willful or malicious cannot premise a claim for punitive damages. Nor may such a claim be premised upon allegations that the defendant forced the plaintiff into the expenses of litigation. Such expenses, with the exception of ordinary court costs, are recoverable only if a statute or the contract itself so provides. E. g., Ablah v. Eyman, 188 Kan. 665, 365 P.2d 181, 90 A.L.R.2d 766.

Appellant also complains of the trial court's denial of a motion to compel Beacon to give further answers to certain interrogatories concerning back charges and offsets made or asserted by Beacon against other subcontractors on the project. The purpose of these interroga-

---

**3.** Costs to Beacon of correcting Carter's "punch list" items were among the sub-

jects of the trial court's second set-off of $1,435.22 in Beacon's favor.

tories, according to appellant, was to show that Beacon had charged other subcontractors with the same damages for the same delay that it was attempting to charge against Carter in the counterclaim. In its answers, Beacon listed three subcontractors with whom litigation or settlements were still pending, but failed to list three additional subcontractors with whom settlements had already been made. Carter moved to compel further answers on grounds that Beacon's replies were evasive, unresponsive and had failed to disclose that Beacon's alleged damages for alleged delays had been substantially reduced by these three prior settlements. Attached to the motion were several pages of affidavits, correspondence and other documents showing both the names of the subcontractors and the amounts of back charges or offsets involved. Although the record does not indicate that any annoyance, expense, embarrassment, or oppression might have resulted to Beacon by compelling further answers, see Fed.R.Civ.P. 33, we think it is clear that denial of the motion in no way prejudiced Carter's position at the trial. Carter, as evidenced by the documents attached to the motion, already had in its possession all of the information which it sought to elicit by compelling further answers. There is no suggestion that the documents were any less probative of the damages issue than Beacon's answers to interrogatories. Thus, while we deem the trial court's ruling to have been improper, we perceive no prejudice warranting reversal to be inherent in the error.

We turn then to the principal issue in this appeal which is whether there is clear error, either in fact or in law, to be found in the trial court's award of $16,-867 as a set-off in favor of Beacon on account of Carter's alleged performance delays. Essentially, appellant urges that the evidence supports an overall project delay of only about half of what the court found and that there was no competent evidence to support a finding that any of the delay was caused by Carter. We conclude that both of appellant's contentions in this regard must be rejected.[4]

■ Appellant places great emphasis on the fact that subsequent to the meeting between Beacon and its subcontractors wherein the parties agreed upon a completion date .of November 1, 1960, the government extended to December 1, 1960 the date for completion of the prime contract by Beacon. It is urged that since Carter's subcontract incorporated Beacon's prime contract by reference, extension of the prime contract operated to extend the performance deadline on the subcontract. We disagree. Both Beacon's extension to its subcontractors and the government's extension to Beacon were due to the change in conditions resulting from the tornado of May 19, 1960. Nothing in Carter's subcontract need be construed as having prevented the parties from setting two different revised completion dates, both of which were adjustments for the same past unforeseen event. Appellant also insists that since the government accepted the project on January 13, 1961, the trial court erred in including as part of the total period of delay the last week, or until January 21, that Beacon was required to maintain operations and facilities on the job site. Suffice it to say that Beacon incurred substantial expenses during that week, as it had in the ten previous weeks, and that such expenses would not have been incurred had Beacon been able to close the project on or before the revised completion date of November 1, 1960.

■■ Appellant makes extensive references to the testimony of witnesses for both sides which, it urges, conclusively

---

4. Our examination of the record, however, lends understanding to the dissatisfaction of appellant with the result of the case and also to the difficulties presented to the trial judge in rendering judgment based essentially upon a determination of credibility. In our opinion, portions of the testimony of every principal witness were refuted in one aspect or another by documentary evidence or by self-contradiction.

shows that none of the delay in completing the project was attributable to Carter. Counsel's advocacy, however, tends to gloss over much of the testimony and other evidence that was favorable to its adversary and that apparently was relied upon by the trial court in formulating its findings of fact, findings which we are now urged to conclude are clearly erroneous. Upon examination of the whole record, we think the evidence may be fairly characterized and summarized as follows: Witnesses for Carter, which included another subcontractor, a government inspector and the government's project supervisor, stated in substance that Carter had not been the cause of any delays, that some delays were caused by other subcontractors, and that much of the overall delay in completion of the project was in fact caused by the organizational incompetency of Beacon. Carter's president admitted to some delays in the electrical phase of the work but insisted that these were caused by Beacon's failure to make payments in accordance with the terms of the subcontract. The only witnesses for Beacon were its general superintendent and job superintendent. They testified in substance that the project was delayed by Carter's delays in (1) installation of "service drops," (2) wiring of basements, (3) installation of kitchen cabinet fluorescent strip fixtures, and (4) performance of other minor work such as installation of a telephone system and television receptacles and correction of "punch list" items. Their testimony in this regard was in part corroborated by the daily logs of construction progress. It is manifest, therefore, that many of the trial court's most important findings represented resolutions of the credibility of witnesses and other similar choices between conflicting evidence of equal weight. Giving the deference that is due the finder of fact in such circumstances, Fed.R.Civ.P. 52(a); United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150; McSorley's, Inc. v. United States, 10 Cir., 323 F.2d

900, 902–03; St. Paul-Mercury Indemnity Corp. v. United States for the Use of Jones, 10 Cir., 238 F.2d 917, 922, we cannot say, in view of the entire record, that any critical aspect of the trial court's portrayal of the facts was clearly erroneous. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Mid-Continent Casualty Co. v. Everett, 10 Cir., 340 F.2d 65, 70. Nor can we accept appellant's argument that the evidence fails to "connect up" the separate delays of Carter with the overall delay of the project and that without such a connection the finding that Carter caused damage to Beacon is nothing more than mere speculation and therefore clearly erroneous as a matter of law. We think the requisite connection is inherent in the findings which showed that after November 1, 1960 much of the work performed was either performed by Carter for the first time or by other subcontractors whose work was dependent, both directly and indirectly, upon electricity and/or heat.

Considerable and, we believe, unwarranted emphasis is also placed by appellant upon the uncontroverted evidence that there were other delays occurring concurrently with Carter's. For example, the major source of damages claimed by Beacon was the delay in installation of the service drops so that the buildings did not have electricity and heat. The evidence shows that there was in addition a similar delay in installation of furnaces. Thus, reasons appellant, even with electricity in the buildings thirty-one days earlier, there still would have been no heat and the vinyl flooring, painting and floor finishing would still have been subjected to the same consequent delays. But since there is no indication that installation of service drops was in any way dependent upon prior installation of furnaces, all appellant can possibly show by its argument is that one or more other people or companies in addition to Carter were jointly responsible for the overall delay in the project work. This fact was clearly and reasonably reflected in the

allocation to Carter of only one-fourth of the relevant damages.[5]

■ Appellant next complains of being denied pre-judgment interest on the net recovery on the ground that it was unreasonable and vexatious for Beacon to withhold payment of a liquidated sum that was admitted to be owing. To the contrary, we think it clear both from the final judgment itself and from a composite view of the record that Beacon's refusal to pay the monies contractually owing pending resolution of the substantial disputed claims over performance delays was in complete good faith. The net recovery was not a liquidated amount but an amount arrived at after adding and subtracting the several claims, both liquidated and unliquidated, with the result that appellant recovered only about two-thirds of what was originally prayed for. Under such circumstances, the Kansas authorities hold that interest may be assessed only from the date of judgment. E. g., Southern Painting Co. of Tenn. v. United States for the Use of Silver, 10 Cir., 222 F.2d 431, 434–36 (citing and applying Kansas law); Geier v. Eagle-Cherokee Coal Mining Co., 181 Kan. 567, 313 P.2d 731, 740.

■ It is finally contended by appellant that the trial court abused its discretion in denying appellant's motion for leave to file a supplemental complaint to show that Beacon had already recovered in settlements with other subcontractors and adjustments with the government much of the damages it had claimed were caused by Carter. The motion was not made until after the trial court had filed

amended findings of fact and conclusions of law which was some five months after the pertinent information was allegedly first brought to appellant's attention. Under the circumstances, the motion was properly treated as based upon newly discovered evidence. Horn v. Allied Mutual Casualty Co., 10 Cir., 272 F.2d 76, 80. Since it appears that the evidence of and surrounding the settlements could have been discovered by appellant during or prior to trial with the exercise of reasonable diligence,[6] we are not able to say that denial of the motion constituted an abuse of discretion.

Affirmed.

---

5. The designation to Carter of one-fourth of the damage to Beacon is arbitrary only in the sense that it represents the considered judgment of the trial court under the complex totality of the circumstances interwoven by the acts of the contractor and the several subcontractors and was not proven as a specific. The trial court actually found that Carter was responsible for thirty days of delay. If the finding is inconsistent with the judgment it favors Carter in result.

6. In a pre-trial conference, Beacon's counsel reported to the trial court in the

presence of Carter's counsel that a settlement had been reached in a case involving claims by Beacon against B & B Dry Wall Company, one of the subcontractors listed by Beacon in its answers to Carter's interrogatories. Other settlements could be assumed to have been known to Carter from the documents attached to its motion to compel further answers. In addition, from documents supplied to the court by Beacon it was shown that the adjustments by the government had nothing in common with the controversy between Beacon and Carter.