**GLENS FALLS INSURANCE COMPANY, Appellant,**

v.

**NEWTON LUMBER & MFG. CO., and Perfection Truss Co., Inc., Appellees.**

**D M H ENTERPRISES, INC., Appellant,**

v.

**NEWTON LUMBER & MFG. CO., and Perfection Truss Co., Inc., Appellees.**

Nos. 8779, 8780.

United States Court of Appeals Tenth Circuit.

Oct. 24, 1967.

---

H. Gayle Weller, Denver, Colo., and Norman E. Walton, Colorado Springs, Colo., for appellants.

Robert E. Anderson, Colorado Springs, Colo. (Horn, Anderson & Johnson, Daniel P. Edwards and Love, Cole & Murphy, Colorado Springs, Colo., on the brief) for appellees.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

PHILLIPS, Circuit Judge.

DMH Enterprises, Inc.,[1] on March 27, 1964, entered into a written contract with the United States Air Force, whereby D MH agreed, as the prime contractor, to furnish all labor and materials and do all the work required to construct a 200-unit family housing project near the Ent Air Force Base in Colorado.

DMH, as principal, and Glens Falls Insurance Company,[2] as surety, executed a payment bond, pursuant to the provisions of § 1 of the Miller Act, 40 U.S. C.A. § 270a(a) (2), c. 642, § 1, 49 Stat. 793.

On February 26, 1965, an action in the name of the United States for the use and benefit of Newton Lumber & Mfg. Co.[3] and Perfection Truss Co., Inc.,[4] was brought to recover from DMH and Glens Falls on the bond, sums due Newton and Perfection for materials furnished by them to Whiteside Construction Company, Inc.[5]

In the complaint it was alleged that Whiteside Construction was a subcontractor of DMH and such materials "were required by * * * DMH" to carry out its prime contract and were furnished "with the knowledge, consent and approval" of DMH.

In their answer DMH and Glens Falls alleged that Earl M. Campbell, doing business as Construction Industries of Colorado, was a subcontractor of DMH and that Whiteside Construction was a subcontractor of Campbell, and therefore neither Newton nor Perfection was entitled to recover on the bond.

From a judgment in favor of Newton and Perfection, DMH and Glens Falls have taken separate appeals.

On April 20, 1964, Campbell and DMH executed a writing which purported to be a subcontract, whereby Campbell agreed to furnish the materials and perform the labor necessary to complete the carpentry and millwork and the installation of weatherstripping and thresholds in compliance with the requirements of the prime contract.

Campbell and Whiteside Construction executed a writing, dated May 6, 1964, which purported to be a subcontract between Campbell and Whiteside Construction, whereby the latter agreed to furnish the materials and perform the work necessary to complete such carpentry and millwork, which were virtually all of the materials, labor and work which Campbell undertook to furnish under his purported subcontract with DMH.

---

1. Hereinafter referred to as DMH.

2. Hereinafter called Glens Falls.

3. Hereinafter called Newton.

4. Hereinafter called Perfection.

5. Hereinafter called Whiteside Construction.

The case was tried to the court, without a jury.

The trial court found that the contract between DMH and Campbell was a sham; that in substance Campbell was the agent of DMH, and that Whiteside Construction was the subcontractor of DMH.

The following facts were established by substantial evidence:

Darrell M. Hills was the president of DMH. He and Campbell were married to sisters and were close friends. For a time, prior to early May, 1964, Campbell had engaged in the full-time practice of dentistry at Minneapolis, Minnesota. Later, from time to time, he practiced dentistry only part-time and engaged in the construction of houses in Minneapolis. Early in May, 1964, he sold his dental practice and moved to Colorado Springs, Colorado.

Campbell saw an invitation for bids in a Government publication for the construction of the housing project here involved. Being desirous of getting into the contracting business, Campbell brought the invitation to the attention of Hills. Hills submitted a bid for the housing project, which was accepted, and culminated in the contract of March 27, 1964. Hills and Campbell reached an understanding about the part Campbell would play with respect to the carrying out of the work on the housing project.

Jack L. Whiteside[6] was president of Whiteside Construction. Prior to April 2, 1964, Whiteside called Hills by telephone with respect to bidding as a subcontractor on the "framing" on the housing project. As a result of the conversation, Whiteside met with Hills at the latter's office in Colorado Springs, Colorado. Hills furnished Whiteside with a set of the plans and specifications for the housing project and they discussed the scope of the work. In the latter part of April, 1964, Whiteside submitted to Hills a bid to furnish certain labor and materials for the project. Hills advised Whiteside his bid was greater than one submitted by another subcontractor and asked him to refigure the job and revise his bid downward. Whiteside did refigure the job and reduced his bid to $452,000. Whiteside advised Hills that Whiteside Construction could not furnish a performance bond. Thereupon, Hills stated that a fee of one per cent would have to be paid to Campbell, and Hills and Whiteside agreed on a final price of $447,500 for the furnishing of the materials and labor embraced in the contract between Whiteside Construction and Campbell, which was the amount of Whiteside's earlier bid, less approximately one per cent.

After the price was agreed on, Hills advised Whiteside that a Mr. Campbell in Minneapolis would sign the contract with Whiteside Construction. Thereafter, Whiteside had a telephone conversation with Campbell. Campbell told Whiteside that Hills had checked Whiteside Construction and Whiteside with their banker and had received a favorable report and that a contract would be drafted. Virtually all the negotiations with respect to the contract between Campbell and Whiteside Construction were carried out between Hills and Whiteside. Hills advised Whiteside his original bid would have to be reduced to meet a bid of another subcontractor, and later advised Whiteside that he and his wife would have to execute a personal note to Campbell for $44,750 to secure Campbell against loss, and that Whiteside's revised bid would have to be further reduced one per cent to provide a fee of one per cent of the bid to Campbell, because Whiteside Construction could not give a performance bond. Whiteside agreed with Hills to reduce his bid to $447,500.

After the telephone conversation between Whiteside and Campbell, the contract, dated May 6, 1964, was prepared by DMH and submitted to Whiteside. When so submitted, Campbell had not signed the contract and was not present. The contract was signed, "Whiteside Construction Company, Inc. By Jack L.

6. Hereinafter called Whiteside.

Whiteside, President." It was later signed "Construction Industries of Colorado. By Earl M. Campbell."

Early in 1964, William M. Hardwicke, the general manager of Perfection, submitted to Hills a bid to provide the roof trusses on the housing project. At that time, Hills told Hardwicke he was negotiating with a Mr. Whiteside to furnish the labor and materials for the framing work and that Whiteside Construction was going to be the framing subcontractor. Hills then asked Hardwicke if the prices he had submitted to Hills could be used by Whiteside and Hardwicke said it would be all right. Hardwicke never heard of Campbell until after Perfection had furnished much of the materials to Whiteside Construction and was having difficulty in obtaining payment therefor from Whiteside Construction. Hardwicke advised Hills he was having trouble collecting from Whiteside Construction and Hills advised him to take the matter up with Campbell. Prior thereto, Hardwicke had been on the job quite often and had never seen Campbell there.

Hills told Vernon M. Hallenbeck, general manager of Newton, that Whiteside Construction would be the framing subcontractor. Hallenbeck testified he saw Campbell on the job from time to time, but believed he was a representative of DMH.

The L & M Builders Supply furnished materials for the housing project. Jack LaRock, the head of that firm, was introduced to Whiteside by a representative of DMH, who told LaRock that Whiteside was the carpentry subcontractor on the job and that all scheduling and delivery would have to be gone over with Whiteside. LaRock had no contacts with Campbell until late in 1964.

When problems arose, as the work progressed, Whiteside talked with Leonard Sweeny, the general superintendent of DMH, or Hills, not with Campbell. Hills and Sweeny frequently gave directions to Whiteside Construction.

Campbell had no workmen on the job until after Whiteside Construction was unable to complete the work under its contract and had left the project in December, 1964. Campbell occupied space with DMH without charge until December 1, 1964, at which time he rented a trailer not being used by DMH. All of Campbell's secretarial work was done by employees of DMH, and Mary Martin, an employee of DMH, kept all of Campbell's records.

We are of the opinion that the evidence of the facts we have narrated afforded ample support for the findings of the trial court, which in substance were as follows: That the contract between DMH and Campbell was a sham; that Campbell permitted the use of his name in the contract with Whiteside Construction for the benefit of DMH; that there was no intent to impose a contractual obligation on Campbell by the contract of April 20, 1964; that the purpose of using Campbell's name in the contract of May 6, 1964, purporting to be a subcontract between Campbell and Whiteside Construction, and the contract of April 20, 1964, purporting to be a subcontract between DMH and Campbell, was to make it appear that Campbell was a subcontractor of DMH and Whiteside Construction a subcontractor of Campbell, and thereby insulate DMH from liability to materialmen for materials furnished to Whiteside Construction for the housing project; and that Campbell's relationship with DMH was that of agent or employee.

In determining whether Whiteside Construction was a subcontractor of the prime contractor, DMH, or a subcontractor of Campbell, the court properly regarded substance, rather than form. Otherwise, the purpose of the remedial statute, to protect suppliers of materials to the actual subcontractors of the prime contractor, could be defeated by setting up by formal contract a straw man as a subcontractor between the prime con-

tractor and one who in substance and intent is the actual subcontractor.[7]

■■ It is true that the evidence was not wholly free from conflict. There was some evidence in the record from which the court might have drawn contrary inferences or factual conclusions. But when an action is tried to a court without a jury, due regard must be given to the fact that the trial judge has an opportunity to see the witnesses while testifying and observe their demeanor on the stand, and is in a much better position to judge of their credibility than is an appellate court on a cold printed record.[8] For that reason, a trial judge's findings will not be set aside unless clearly erroneous,[9] and if different inferences reasonably may be drawn from the evidence, the inferences drawn by the trial court will not be set aside unless clearly erroneous.[10]

■ After a careful examination of the entire record, we are fully convinced that the findings made and the inferences drawn by the trial court are fully warranted by the evidence and are not clearly erroneous.

■ Finally, Glens Falls and DMH contend that Newton and Perfection were estopped to deny that Campbell was the subcontractor of DMH and that Whiteside was the subcontractor of Campbell.

Rule 8(c) of the Fed.Rules Civ.Proc. 28 U.S.C.A., provides that estoppel is an affirmative defense and must be set forth affirmatively in the pleading of the party who asserts it. Here, neither Glens Falls nor DMH pleaded estoppel in their answers.

On December 1, 1965, after the introduction of evidence had been completed and all parties had rested, counsel for Glens Falls stated:

" * * * I would like to make a motion to the Court to amend our pleadings to include the defense of estoppel against the use plaintiffs, which I think the evidence has shown."

That was the first time in the proceedings where the defense of estoppel was mentioned.

In response to such motion, the court ruled that Glens Falls and DMH should prepare and tender a formal amendment to their respective answers, which we think meant a written motion, setting forth the proposed amendment and asking leave to file it. We think the court's ruling was proper.

The record fails to show that either Glens Falls or DMH at any time prepared and tendered a formal amendment to their respective answers or oth-

7. See: St. Paul-Mercury Indemnity Company v. United States, 10 Cir., 238 F.2d 917, 921;
Ryan v. Bethlehem Sparrow Point Shipyard, 4 Cir., 209 F.2d 53, 56.

8. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.;
McSorley's, Inc. v. United States, 10 Cir., 323 F.2d 900, 902–903;
St. Paul-Mercury Indemnity Company v. United States, 10 Cir., 238 F.2d 917, 922;
Carter Electric Co. v. Travelers Indemnity Co., 10 Cir., 382 F.2d 567, 573;
British American Assur. Co. v. Bowen, 10 Cir., 134 F.2d 256, 260.

9. United States v. Oregon State Med. Soc., 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978;
Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.;
Friedman v. Fordyce Concrete, Inc., 8 Cir., 362 F.2d 386, 387;

Kerr v. C. I. R., 9 Cir., 326 F.2d 225, 229, cert. den. 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735;
Los Angeles Extension Co. v. United States, 9 Cir., 315 F.2d 1, 3;
Todd v. United States, 10 Cir., 362 F.2d 531, 532.

10. Mitsugi Nishikawa v. Dulles, 9 Cir., 235 F.2d 135, 141;
Southwestern Investment Co. v. Cactus Motor Co., 10 Cir., 355 F.2d 674, 676;
Wilsey-Bennett Trucking Company v. Frost, 10 Cir., 275 F.2d 144, 147;
Lindsey v. Oregon-Washington Plywood Company, 10 Cir., 287 F.2d 710, 711;
Friedman v. Sealy, Inc., 10 Cir., 274 F.2d 255, 258;
Saturn Oil & Gas Co. v. Northern Natural Gas Co., 8 Cir., 359 F.2d 297, 303.

erwise took any further action to secure permission to amend their answers by a formal pleading setting up estoppel.

An order entered on February 3, 1966, granting leave to Glens Falls and DMH to amend their answers in nowise refers to estoppel, and even if it did, no amendment to their respective answers setting up estoppel was ever filed by Glens Falls and DMH.

Glens Falls and DMH next mentioned estoppel at a hearing on February 3, 1966. After counsel had presented a brief argument on the defense of estoppel, the court stated with respect to such defense:

"* * * the difficulty * * * insofar as it depends on factual material, is that they have had no opportunity to respond to it. It comes at this late stage, you know. Some of these arguments you make are just not valid, because they have had no opportunity to put in evidence to refute your legal theory * * *."

Counsel for Glens Falls and DMH then stated:

"* * * this is based solely upon the evidence that was brought forth at the trial * * *."

The court then stated:

"* * * But, the shape of the legal issues determines what kind of evidence you put in, lots of times. * * *"

Thereafter, Glens Falls and DMH filed a motion for a new trial, and as one of the grounds therefor set up that the court erred in not holding the use plaintiffs were barred from recovery by estoppel. The court denied the motion for a new trial.

A careful examination of the evidence and other pertinent parts of the record of the proceedings below leads us to conclude that the defense of estoppel was not pleaded, was not timely asserted, and was not established by the evidence adduced at the trial.

For the reasons indicated, we affirm the judgments in favor of Newton and Perfection.